15-1683; 15-1693; 15-1700
*Lanier v. Bats Exchange, Inc.*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2015

(Argued: March 3, 2016   Decided: September 23, 2016)

Docket No. 15-1683

HAROLD R. LANIER, on behalf of himself individually
and on behalf of others similarly situated,

*Plaintiff-Appellant,*

— v. —

BATS EXCHANGE, INC., BATS Y-EXCHANGE INC., CHICAGO BOARD
OPTIONS EXCHANGE INC., CHICAGO STOCK EXCHANGE INC.,
EDGA EXCHANGE INC., EDGX EXCHANGE INC., INTERNATIONAL
SECURITIES EXCHANGE, LLC, NASDAQ OMX BX INC., NASDAQ OMX
PHLX LLC, THE NASDAQ STOCK MARKET, LLC, NATIONAL STOCK
EXCHANGE, INC., NEW YORK STOCK EXCHANGE LLC, NYSE ARCA INC.,
NYSE MKT LLC,

*Defendants-Appellees.*

Docket No. 15-1693

HAROLD R. LANIER, on behalf of himself individually
and on behalf of others similarly situated,

*Plaintiff-Appellant,*

— v. —

BATS EXCHANGE, INC., BATS Y-EXCHANGE INC., CHICAGO BOARD
OPTIONS EXCHANGE INC., CHICAGO STOCK EXCHANGE INC.,
EDGA EXCHANGE INC., EDGX EXCHANGE INC., INTERNATIONAL
SECURITIES EXCHANGE, LLC, NASDAQ OMX BX INC., NASDAQ OMX
GROUP, INC., NASDAQ OMX
PHLX LLC, THE NASDAQ STOCK MARKET, LLC, NATIONAL STOCK
EXCHANGE, INC., NEW YORK STOCK EXCHANGE LLC, NYSE ARCA INC.,
NYSE MKT LLC,

*Defendants-Appellees.*

Docket No. 15-1700

HAROLD R. LANIER, on behalf of himself individually
and on behalf of others similarly situated,

*Plaintiff-Appellant,*

— v. —

BATS EXCHANGE, INC., BOX OPTIONS EXCHANGE LLC, C2 OPTIONS
EXCHANGE, INCORPORATED, CHICAGO BOARD
OPTIONS EXCHANGE INC., INTERNATIONAL

SECURITIES EXCHANGE, LLC, ISE GEMINI, LLC, MIAMI INTERNATIONAL
SECURITIES EXCHANGE, LLC, NASDAQ OMX BX INC., NASDAQ OMX
PHLX LLC, THE NASDAQ STOCK MARKET, LLC,
NYSE ARCA INC., NYSE MKT LLC,

*Defendants-Appellees.*

---

B e f o r e:

CABRANES, LIVINGSTON, and LYNCH, *Circuit Judges.*

---

Plaintiff-Appellant Harold Lanier contracts with the Defendants-Appellees, national securities exchanges, to receive consolidated data, via a securities information processor, about securities traded on the Appellees' exchanges. Lanier alleges that the Appellees breached their contracts by allowing customers who pay for direct market data feeds from each securities exchange to receive market data faster than the securities information processor receives the same data. The distribution of market data is governed by the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (the "Exchange Act"), and regulated by the SEC. The United States District Court for the Southern District of New York (Katherine B. Forrest, *Judge*) held that it lacked subject matter jurisdiction because Lanier's breach of contract claims were preempted by the Exchange Act and relevant SEC regulations.

We conclude that we have subject matter jurisdiction to consider Lanier's claims, but, because we agree that Lanier has failed to state a claim, we affirm the district court's dismissal of the claims. To the extent Lanier alleges that the requirement that the securities information processor receive data no later than any other customer arises from the incorporation of SEC regulations into the contract, his interpretation conflicts with the SEC's own interpretation of those regulations, and, because adopting his interpretation would create an obstacle to Congress' intent to create a national market system regulated by the SEC, Lanier's claims are preempted. Insofar as Lanier asserts that his claims derive

from a self-imposed promise made by the Appellees in the contracts, that assertion has no basis in the text of the contracts and thus fails to state a claim. To the extent that Lanier argues that the SEC has interpreted the obligations imposed on Appellees by statute or regulation incorrectly, any such argument must be exhausted before the SEC before it can be adjudicated by a court.

AFFIRMED.

MICHAEL T. LEWIS, SR. (Pauline Shuler Lewis, *on the brief*), Lewis and Lewis, Oxford, Mississippi, *for Plaintiff-Appellant*.

DOUGLAS R. COX (Scott P. Martin, Michael R. Huston, Alex Gesch, *on the brief*), Gibson, Dunn & Crutcher LLP, Washington, D.C., *for Defendants-Appellees* NASDAQ OMX BX Inc., NASDAQ OMX Group, Inc., NASDAQ OMX PHLX LLC, and The Nasdaq Stock Market, LLC.

Douglas W. Henkin, Baker Botts LLP, New York, New York, *for Defendants-Appellees* New York Stock Exchange LLC, NYSE ARCA Inc., and NYSE MKT LLC.

Paul E. Greenwalt, III, Schiff Hardin LLP, Chicago, Illinois *for Defendants-Appellees* C2 Options Exchange, Incorporated and Chicago Board Options Exchange, Inc.

Seth L. Levine and Christos G. Papapetrou, Levine Lee LLP, New York, New York, *for Defendant-Appellee* Chicago Stock Exchange Inc.

Charles E. Dorkey, III, Dentons US LLP, New York, New York, *for Defendant-Appellee* National Stock Exchange, Inc.

James A. Murphy and Theodore R. Snyder, Murphy & McGonigle, P.C., New York, New York, Joseph Lombard, Murphy & McGonigle, P.C., Washington, D.C., *for Defendants-Appellees* BATS Exchange,

Inc., BATS Y-Exchange, Inc., EDGA Exchange Inc., EDGX Exchange Inc., ISE Gemini, LLC, and International Securities Exchange, LLC.

Michael D. Blanchard and Christopher Wasil, Morgan, Lewis & Bockius LLP, Hartford, Connecticut, *for Defendant-Appellee* Box Options Exchange LLC.

David John Ball, Michael Craig Hefter, and Mark N. Mutterperl, Bracewell & Guiliani LLP, New York, New York, *for Defendant-Appellee* Miami International Securities Exchange, LLC.

GERARD E. LYNCH, *Circuit Judge*:

Plaintiff-Appellant Harold Lanier subscribes to data feeds through which the Defendants-Appellees Securities Exchanges ("the Exchanges") provide information about securities traded on the Exchanges to an exclusive securities information processor ("Processor") pursuant to a plan approved by the Securities and Exchange Commission ("SEC"). The Processor consolidates the data and makes it available to subscribers ("Subscribers"). *See* 15 U.S.C. § 78c(a)(22)(B) (defining the term "exclusive processor"); *id.* § 78k-1(b) (setting forth rules governing securities information processors). Lanier filed three materially identical lawsuits in the United States District Court for the Southern District of New York on behalf of himself and others similarly situated (collectively "the Complaints"), alleging that the Exchanges had breached their contracts with him by providing preferentially fast access to the so-called

"Preferred Customers," who purchase data and receive it from an Exchange directly via its proprietary feed. The Exchanges moved to dismiss and the district court (Katherine B. Forrest, *J.*) granted the motion, dismissing all of the Complaints in one opinion. The district court held that it lacked subject matter jurisdiction and that, in any event, Lanier's factual allegations were insufficient to state a claim. *See Lanier v. BATS Exch., Inc.*, 105 F. Supp. 3d 353 (S.D.N.Y. 2015). Lanier appealed in each case, and we resolve all three appeals together in this opinion.[1]

We affirm the district court's decision to grant the Exchanges' motion to dismiss but for somewhat different reasons than those expressed by the district court. We conclude that the court erred in holding that it lacked subject matter jurisdiction to consider Lanier's breach of contract claims, but affirm the dismissal of the Complaints for failure to state a claim. Lanier has not plausibly alleged that the Exchanges violated any contractual obligation by simultaneously sending data to both the Processor and the Preferred Customers that is *received* earlier by the Preferred Customers. To the extent that Lanier alleges that such a

---

[1] Unless otherwise noted, references to the Joint Appendix are to the Joint Appendix filed in No. 15-1700.

contractual obligation arises from the incorporation of SEC regulations into the contracts, his claims are preempted because Lanier's interpretation conflicts with the SEC's interpretation and stands as an obstacle to the accomplishment of congressional purposes. To the extent that Lanier alleges that the Exchanges undertook self-imposed contractual obligations, distinct from their regulatory obligations, to ensure that market data is not received by any customer before it is received by the Processor, that claim fails because it has no basis in the text of the contracts. To the extent that Lanier argues that the SEC has interpreted the Exchanges' obligations under the Exchange Act or SEC regulations incorrectly, any such argument must first be administratively exhausted before the SEC before it can be considered by this Court.

## BACKGROUND

National securities exchanges, like the defendants in this case, must register with the SEC, and, if approved by that agency, they become self-regulatory organizations ("SROs"). *See* 15 U.S.C. §§ 78f(a), 78c(a)(26). SROs exercise considerable authority, subject to SEC approval, oversight, and possible revocation of SRO status. *See, e.g.*, *id.* §§ 78f(b)(5), 78k-1(a)(3)(B); *see also DL Capital Grp., LLC v. Nasdaq Stock Mkt., Inc.*, 409 F.3d 93, 95 (2d Cir. 2005). The SEC

7

may not register a national securities exchange unless it finds that the "rules of the exchange are designed . . . to protect investors and the public interest; and are not designed to permit unfair discrimination between customers, issuers, brokers, or dealers . . . ." 15 U.S.C. § 78f(b)(5).

One duty of the Exchanges is to distribute market data about the trades of securities made on their platforms. In 1975, Congress amended the Exchange Act to regulate market information by requiring the creation of a national market system "linking [] all markets for qualified securities through communication and data processing facilities." 15 U.S.C. § 78k-1(a)(1)(D). Thus, "market information, at least since 1975, has been subject to comprehensive regulation under the Exchange Act." Regulation of Market Information Fees and Revenues, 64 Fed. Reg. 70613-01, 70615 (Dec. 17, 1999); *see also* Securities Act Amendments of 1975, H.R. Conf. Rep. No. 94-229, *reprinted in* 1975 U.S.C.C.A.N. 321.

To accomplish that objective, Congress authorized the SEC "by rule or order, to authorize or require [SROs] to act jointly with respect to matters as to which they share authority under this chapter in planning, developing, operating, or regulating a national market system." 15 U.S.C. § 78k-1(a)(3)(B). The SEC is authorized to impose rules "as necessary or appropriate in the public

interest, for the protection of investors," or otherwise in furtherance of the statute's purpose, *id.* § 78k-1(c)(1), to ensure that investors "may obtain on terms which are not unreasonably discriminatory . . . information with respect to" securities transactions "as is published or distributed by any [SRO]," *id.* § 78k-1(c)(1)(D). SROs are required to comply with the SEC's rules and regulations regarding distribution of "information with respect to quotations for or transactions in any security other than an exempted security." *Id.* § 78k-1(c)(1).

The SEC adopted Regulation NMS in 2005 "to modernize and strengthen the national market system ('NMS') for equity securities." Regulation NMS, 70 Fed. Reg. 37496, 37496 (June 29, 2005) (codified at 17 C.F.R. § 242.600 *et seq.*). Regulation NMS amended and updated regulations that had governed distribution of market data through joint plans since 1975. *See id.* at 37503.

Every exchange that trades NMS securities must file a transaction reporting plan ("NMS Plan") with the SEC for its approval. *See* 17 C.F.R. § 242.601. The proposed NMS Plan must include "[t]he terms and conditions under which brokers, dealers, and/or self-regulatory organizations will be granted or denied access" and the fees the Exchanges will charge, among many

9

other requirements. *Id.* §§ 242.608(a)(5)(i), (ii). With respect to the dissemination

of data, Regulation NMS provides:

> Every national securities exchange on which an NMS
> stock is traded and national securities association shall
> act jointly pursuant to one or more effective national
> market system plans to disseminate consolidated
> information, including a national best bid and national
> best offer, on quotations for and transactions in NMS
> stocks. Such plan or plans shall provide for the
> dissemination of all consolidated information for an
> individual NMS stock through a single plan processor.

*Id.* § 242.603(b). Further, the quotation and transaction information must be

distributed "on terms that are not unreasonably discriminatory." *Id.*

§ 242.603(a)(2). After the NMS Plan is approved by the SEC, each SRO "shall

comply with the terms of any effective national market system plan of which it is

a sponsor or a participant." *Id.* § 242.608(c).

Each NMS Plan designates a Processor, which collects data from each

participating exchange, consolidates the data, calculates the "national best bid

and offer" ("NBBO") and updates "last sale" information for each security, and

then disseminates that data via a subscriber feed. As relevant to this appeal, the

Exchanges have created four NMS Plans, pursuant to which the Exchanges

distribute market data to Subscribers.[2] Subscribers, such as Lanier, gain access to

market data via the Processors by signing contracts ("Subscriber Agreements")

with the Exchanges. The Subscriber Agreements incorporate by reference the

SEC Rules, the Exchange Act, and the relevant NMS Plan.

Exchanges are also authorized to "distribute their own data

independently" as long as they also continue to provide data through the

Processor pursuant to an NMS Plan. Regulation NMS, 70 Fed. Reg. at 37503; *see*

*id.* at 37567 n.638. An Exchange "that distributes information with respect to

quotations for or transactions in an NMS stock to a securities information

---

[2] The four plans are: (1) The CTA Plan, which covers transactions for securities listed on stock exchanges other than NASDAQ; (2) The CQ Plan, for the Consolidated Tape System, which covers quotes for securities listed on stock exchanges other than NASDAQ; (3) The Joint Self-Regulatory Organization Plan Governing the Collection, Consolidation and Dissemination of Quotation and Transaction Information for NASDAQ-listed Securities Traded on Exchanges on an Unlisted Trading Privilege Basis, also called the "NASDAQ UTP Plan," which covers transactions and quotes for securities listed on NASDAQ; and (4) the OPRA Plan, for the Options Price Reporting Authority ("OPRA") System, which covers transactions and quotes for exchange-listed options. The SEC has approved all of those Plans. *See* Exchange Act Release No. 34-10787, 39 Fed. Reg. 17,799 (May 20, 1974) (CTA Plan); Exchange Act Release No. 34-15009, 43 Fed. Reg. 34,851 (Aug. 7, 1978) (CQ Plan); Exchange Act Release No. 34-28146, 55 Fed. Reg. 27,917 (July 6, 1990) (NASDAQ UTP Plan); Exchange Act Release No. 34-17638, 1981 WL 36678 (Mar. 18, 1981) (OPRA Plan).

processor, broker, dealer, or other persons shall do so on terms that are not unreasonably discriminatory." 17 C.F.R. § 242.603(a)(2). Thus consumers who purchase access to the proprietary data feeds, referred to in the Complaints as "Preferred Customers," can access market data directly from an Exchange through a premium distribution channel, rather than as a subscriber to a consolidated feed transmitted through a Processor.

Lanier's Complaints allege, and we accept as true for purposes of this appeal, that the Exchanges disseminate the same market data they send to the Processor directly to the Preferred Customers through proprietary feeds for higher fees, which bring substantial revenue to the Exchanges.[3] Due to the size of the connection's capacity/bandwidth, the transfer protocol, and the physical co-location of the Preferred Customers' servers near the Exchange server transmitting the data,[4] the Preferred Customers receive data as quickly as one

---

[3] Lanier alleges that the revenue from the provision of market data constitutes as much as 20% of the total revenue of the NYSE and NASDAQ.

[4] "Co-location is a service offered by trading centers that operate their own data centers and by third parties that host the matching engines of trading centers. The trading center or third party rents rack space to market participants that enables them to place their servers in close physical proximity to a trading center's matching engine." Concept Release on Equity Market Structure, 75 Fed. Reg. 3594-01, 3610 (Jan. 21, 2010).

12

microsecond after data is sent. It can take 1500 microseconds for the same data to arrive at the Processor, and an even longer delay before the data reaches Subscribers. The Preferred Customers are advantaged by the speed at which they receive market data because they receive data faster than the Subscribers, who consequently trade on stale data, and the Exchanges profit by charging additional fees for the speed advantage they sell to Preferred Customers.

In adopting Rule 603 as part of Regulation NMS, the SEC specifically noted that the Regulation did not require that the *receipt* of data by end-users be synchronized. Rather, the SEC explained that Rule 603 prohibited an Exchange "from *transmitting* data to a vendor or user any sooner than it transmits the data to [the P]rocessor." Regulation NMS, 70 Fed. Reg. at 37567 (emphasis added). Consistent with that pronouncement, the SEC has approved tools – including the use of proprietary, unconsolidated feeds and co-location – that deliver data to Preferred Customers faster than to users of the Processor even where the data is transmitted at the same time. *See, e.g.*, Self-Regulatory Organizations; New York Stock Exchange LLC; Order Approving Proposed Rule Change To Establish Fees for NYSE Trades, 74 Fed. Reg. 13293-01, 13,294 & n.7 (Mar. 26, 2009); Self-Regulatory Organizations; NYSE Amex LLC; Order Approving a Proposed Rule

13

Change Amending Its Price List To Reflect Fees Charged for Co-Location

Services, 75 Fed. Reg. 59299-02, 59300 (Sept. 27, 2010).

## DISCUSSION

Lanier filed the Complaints alleging breach of contract claims and related state-law claims on behalf of a putative class of subscribers on the basis of diversity-of-citizenship jurisdiction, 28 U.S.C. § 1332(d)(2). Lanier alleges that the Exchanges breached their contracts because Preferred Customers receive market data up to 1,499 microseconds faster than Subscribers. The Exchanges filed consolidated motions to dismiss all of the claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The district court granted the motions, holding that it lacked subject-matter jurisdiction because Lanier's claims are preempted, and that even if it considered the merits of the Complaints, Lanier failed to state a claim that the Exchanges had breached their contracts.[5]

---

[5] The district court stated that "whether this Court has subject matter jurisdiction over Lanier's claims depends on whether those claims have been preempted by the Exchange Act and various regulations promulgated thereunder," J.A. 272-273, and, concluding that the claims were preempted, held that it "lack[ed] subject matter jurisdiction over this action," J.A. 281. Preemption, however, is a defense that goes to the merits of a claim, not to subject matter jurisdiction. *See, e.g., Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 228 (1995) (considering the question of preemption of a breach of contract claim as a question on the merits, not one of

As a threshold matter, we must first satisfy ourselves that we have subject

matter jurisdiction. We hold that we do. But having considered Lanier's

allegations, we conclude that he has failed to state a claim on which relief can be

granted. Lanier's interpretation of what the Subscriber Agreements require is,

depending on how his claims are construed, preempted by the SEC's own

interpretation of these same obligations, unsupported by the text of the contracts,

or must be exhausted before the SEC before it can be addressed by the courts.

## I.    Subject Matter Jurisdiction

The Exchanges argue that the district court lacked subject matter

jurisdiction because Lanier was required to seek SEC review of his claims first

and then appeal any adverse decision directly to the court of appeals, rather than

filing the suit in the district court.[6] A district court lacks subject matter

jurisdiction to hear claims where Congress creates a comprehensive regulatory

---

subject matter jurisdiction). Moreover, we note that when a district court determines it lacks jurisdiction, it should dismiss the case and should not, as the district court did here, proceed to the merits. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). The Exchanges do not argue otherwise.

[6] This argument about subject matter jurisdiction differs from the preemption argument adopted by the district court and rejected by us in note 5, *supra*, and was not addressed below.

15

scheme from which it is fairly discernible that Congress intended that agency expertise would be brought to bear prior to any court review.[7]

Determining whether Congress implicitly precluded federal district court jurisdiction over a claim prior to administrative review involves a two-step analysis. First, "we must . . . determine whether it is fairly discernible from the text, structure, and purpose of the securities laws that Congress intended the SEC's scheme of administrative and judicial review to preclude district court jurisdiction." *Tilton v. Sec. & Exch. Comm'n*, 824 F.3d 276, 281 (2d Cir. 2016) (internal quotation marks omitted). Second, "[i]f we conclude that the SEC's scheme precludes district court jurisdiction, we must then decide whether the appellant['s] . . . claim is of the type Congress intended to be reviewed within th[e] statutory structure." *Id.* (internal quotation marks omitted).

That second step is guided by the three so-called *Thunder Basin* factors. *See id.*; *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 209 (1994).

---

[7] The issue of whether the subject matter jurisdiction of district courts is stripped by a statutory scheme is different from the issue of whether a plaintiff must exhaust administrative remedies. Among other distinctions, courts must assure themselves of subject matter jurisdiction whether or not the parties raise the issue, while exhaustion is a waivable requirement, which we discuss in Section II.C, *infra*.

Those factors are: (1) whether "'a finding of preclusion could foreclose all meaningful judicial review'"; (2) whether the suit is "'wholly collateral to a statute's review provisions'"; and (3) whether the claims are "'outside the agency's expertise.'" *Tilton*, 824 F.3d at 281, quoting *Thunder Basin*, 510 U.S. at 212-13. Affirmative answers to these three questions "instruct us to 'presume' that a claim is not confined to administrative channels." *Id.*

We need not address the first step of the *Tilton* analysis – whether the SEC's scheme of administrative and judicial review evidences an intent to preclude district court jurisdiction of at least some claims – because, assuming *arguendo* that it does, Lanier's contract claims are not the type that Congress intended to be reviewed within the statutory structure under the second step of the *Tilton* analysis.

### A. Wholly Collateral

We find it convenient to begin with the "wholly collateral" factor, and postpone consideration of the "foreclosing judicial review" factor until after consideration of the other factors. A claim is wholly collateral if it is not "procedurally intertwined" with an ongoing administrative proceeding. *Tilton*, 824 F.3d at 288. The "procedurally intertwined" inquiry is not relevant to this

case as there is no proceeding currently pending before the SEC. Although we have not expressly adopted the view that a claim must also not be substantively intertwined with the merits dispute of an ongoing proceeding (or a proceeding that could be brought before the agency) to be wholly collateral, we assume *arguendo* that this approach also applies.[8]

Lanier's contract claims are not substantively intertwined with the merits of an issue that, under the statute's review provisions, must first be heard by the SEC. The Exchange Act provides a scheme for judicial review of certain SEC decisions: "[a] person aggrieved by a *final order* of the Commission . . . may obtain review of the order in the United States Court of Appeals . . . by filing in such court, within sixty days after the entry of the order, a written petition requesting that the order be modified or set aside in whole or in part," 15 U.S.C. § 78y(a)(1) (emphasis added), and "[a] person adversely affected by a *rule* of the

---

[8] In *Tilton* we did not expressly adopt the approach "that a claim is *not* wholly collateral to an administrative proceeding only if it is substantively intertwined with the merits dispute that the proceeding was commenced to resolve," and instead applied only the approach "that a claim is not wholly collateral if it has been raised in response to, and so is procedurally intertwined with, an administrative proceeding—regardless of the claim's substantive connection to the initial merits dispute in the proceeding." *Tilton*, 824 F.3d at 287 (emphasis in original); *see id.* at 288-89. Nevertheless, we assume *arguendo* that both standards apply because the same result holds with respect to both standards.

Commission . . . may obtain review of this rule in the United States Court of Appeals . . . by filing in such court, within sixty days after the promulgation of the rule, a written petition requesting that the rule be set aside," *id.* § 78y(b)(1) (emphasis added). But the breaches of contract that Lanier alleges are not justiciable by "final order[s] of the [SEC]," *id.* § 78y(a)(1), nor are they "rule[s] of the [SEC]," *id.* § 78y(b)(1), and are thus wholly collateral to the statute's review provisions. Two Supreme Court cases support our conclusion.

In *American Airlines, Inc. v. Wolens*, the plaintiffs alleged that American Airlines breached its contracts with frequent flyer program participants by imposing certain retroactive modifications to the program. 513 U.S. 219, 225 (1995). American Airlines argued that the plaintiffs' claims had to be brought before the Department of Transportation "as the exclusively competent monitor of the airline's undertakings" under the Airline Deregulation Act's ("ADA") review provision. *Id.* at 230. The Supreme Court disagreed and explained that, in enacting the ADA, "lawmakers indicated no intention to establish, simultaneously, a new administrative process for DOT adjudication of private contract disputes." *Id.* at 232. The Court distinguished between contract obligations and obligations imposed by law because "[a] remedy confined to a

contract's terms simply holds parties to their agreements." *Id.* at 229. The Court found it relevant that an apparatus that required administrative review by the DOT would "channel into federal courts the business of resolving, pursuant to judicially fashioned federal common law, the range of contract claims," and concluded that Congress could not plausibly be understood to have intended that result. *Id.* at 232. In reaching that conclusion, the Court also relied on the ADA's saving clause and on the fact that the DOT had not construed its role as including the resolution of contract disputes. *Id.* at 232-33.

Like the ADA, the Exchange Act demonstrates no intention to establish an administrative process for the SEC to adjudicate private contract disputes. And like the plaintiffs in *Wolens*, Lanier seeks to pursue a private contract claim. The Exchange Act, like the ADA, includes a saving clause stating that "the rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity." 15 U.S.C. § 78bb(a)(2). And like the DOT, the SEC has not construed its role to include adjudicating private contract disputes. *See, e.g.,* Application of the Am. Stock Exch., Inc., Exchange Act Release No. 42312, 54 SEC Docket 491, 2000 WL 3804, at *4-5 (Jan. 4, 2000) (declining to consider the appeal of a dispute between the participants in an

NMS Plan concerning their share of the annual revenue because it involved "an ordinary commercial dispute" which is "fundamentally a contract dispute" better suited for resolution in the courts). *Wolens* thus supports our conclusion that the resolution of contract law claims, at least those involving self-imposed undertakings separate and apart from the SEC's regulations, is not reserved exclusively to the SEC.

Similarly, in *Free Enterprise Fund*, the Supreme Court held that the district court had subject matter jurisdiction to consider the plaintiffs' constitutional challenge to the creation of the Public Company Accounting Oversight Board. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 (2010). Rejecting the government's argument that the plaintiffs were required to first seek review by the SEC, the Supreme Court explained that judicial review was not precluded because 15 U.S.C. § 78y "provides only for judicial review of [SEC] action" and the plaintiffs' challenge was "collateral" to any SEC orders or rules, which could be reviewed within the regulatory structure. *Id.* at 490. That analysis is equally applicable to this case, and supports our conclusion that Lanier's contract claims are wholly collateral.

Relying principally on *Altman v. SEC* and similar cases, the Exchanges argue that we have previously required plaintiffs bringing constitutional claims related to SEC regulations to first seek review before the SEC. *See Altman v. SEC*, 687 F.3d 44, 46 (2d Cir. 2012). But *Altman* addressed the jurisdiction of a district court to hear challenges to SEC sanctions imposed on members; we held that an attorney who sought review of an SEC order sanctioning him by imposing a lifetime ban on practicing before the SEC must seek review according to the statutory procedure (that is, before the SEC and then in the court of appeals). 687 F.3d at 45-46. Although the plaintiff's claim included a constitutional challenge, it essentially amounted to a challenge to the manner in which the agency has enforced its own rules and accordingly bears little resemblance to this case.

## B. Agency Expertise

Questions of contract interpretation and breach are outside the SEC's competence and expertise and are of a kind "which the courts are at no disadvantage in answering." *Free Enter. Fund*, 561 U.S. at 491. In *Free Enterprise Fund* the Court explained that the plaintiffs' claims were "outside the [SEC's] competence and expertise," because they did not require a technical understanding of the industry or considerations of agency policy, and involved

"standard questions of administrative law, which the courts are at no disadvantage in answering." *Id.* The same is true here. Contract law is not a subject about which the agency has particular expertise, and the interpretation of contracts is squarely within the core competency of the judiciary. Therefore, this factor also supports the conclusion that the district court had subject matter jurisdiction.[9]

## C. Meaningful Judicial Review

Whether as a practical matter a party will be able to obtain meaningful judicial review if the district court does not have subject matter jurisdiction also

---

[9] That conclusion is fully consistent with our recent decision in *Tilton*, in which we explained that the Supreme Court has "adopted a broader conception of agency expertise in the jurisdictional context" that includes situations in which "an agency may bring its expertise to bear" indirectly "by resolving accompanying statutory claims that it 'routinely considers,' and which 'might fully dispose of the case' in the appellants' favor." *Tilton*, 824 F.3d at 289, 290, quoting *Elgin v. Dep't of Treasury*, 132 S. Ct. 2126, 2140 (2012). Under *Tilton*, the fact that a particular claim is not within the agency's expertise does not necessarily open the doors to federal district court, for example if such claim is raised in the context of an adjudication in which other intertwined issues are in the expertise of the agency. Unlike in *Tilton*, however, there is no argument in this case that any proceeding before the SEC on a matter within the expertise of the SEC could fully resolve this case in Lanier's favor.

weighs in favor of finding that the court had jurisdiction in this case. *See Thunder Basin Coal Co.*, 510 U.S. at 214. Lanier argues that he principally seeks monetary damages and, as we have previously acknowledged, "the administrative review provisions of the [Exchange] Act do not provide for money damages." *Barbara v. N.Y. Stock Exch., Inc.*, 99 F.3d 49, 57 (2d Cir. 1996), *abrogated on other grounds by Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct. 1562 (2016); *cf.* Citadel Sec. LLC, Exchange Act Release No. 78340, at *10-11 (July 15, 2016) (explaining that the "civil money penalties that the [SEC] is authorized to seek" and "disgorgement" are not the same as damages).

The Exchanges argue that Lanier has an avenue open for administrative review of his claims, 17 C.F.R. § 242.608(d), which would result in a final order, and be subject to review in a court of appeals, 15 U.S.C. § 78y(a)(1). But that administrative review allows the SEC to "entertain appeals in connection with the implementation or operation of any effective national market system plan," 17 C.F.R. § 242.608(d), and to the extent that Lanier brings a contract law claim that does not arise from such SEC requirements, § 242.608(d) does not encompass such a claim. Because it is at the very least unclear whether the statutory structure provides Lanier an avenue to have his contract claims heard before the

SEC, and because it *is* clear that the damages to which he would be entitled if he prevailed under state contract law are unavailable even if an agency procedure was possible, the meaningful judicial review factor also weighs in favor of district court jurisdiction.

In sum, the *Thunder Basin* factors weigh decisively in favor of finding that the district courts have jurisdiction to hear Lanier's claims, which are asserted as state-law breach of contract claims. We thus conclude that the district court erred in finding that it lacked subject matter jurisdiction.

## II.     Failure to State a Cognizable Contract Claim

"We review a district court's dismissal of a complaint pursuant to Fed. R. Civ. P. 12(b)(6) de novo, accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *Id.* (internal quotation marks omitted). "[A] court must accept as true all of the allegations contained in a complaint," but need not accept "threadbare recitals of the

elements of a cause of action', supported by mere conclusory statements."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Lanier argues that the Complaints allege state-law breach of contract claims based on promises made by the Exchanges in the various Subscriber Agreements to deliver current market data to Lanier in a "fair" and "non-discriminatory" manner, J.A. 117 ¶¶ 1, 3, as promptly as possible. Lanier contends that those contract terms prohibit Preferred Customers from receiving market data and best price information before the Processor.

After considering Lanier' s arguments, we hold that he has failed to state a claim upon which relief can be granted and affirm the dismissal by the district court.[10] The Complaints may be read as alleging (1) that the Subscriber Agreements incorporate the relevant SEC regulations such that violation of the regulations also constitutes a breach of Lanier's contracts; (2) that the Exchanges undertook some obligation that is independent of SEC regulations through the Subscriber Agreements and that was then breached by the faster provision of

---

[10] Because we affirm the district court's holding that the complaint should be dismissed, we need not reach the Exchanges' alternative argument that Lanier's damages claims are barred by absolute immunity.

market data to the Preferred Customers; or (3) that the SEC has misinterpreted its own regulations and the Exchange Act in approving practices that enable Preferred Customers to receive market data prior to the Processor. To the extent that Lanier claims that the obligation to ensure that the Processor receives data no later than the Preferred Customers derives from the incorporation by reference of SEC regulations, that argument turns on an interpretation of the relevant regulations that conflicts with the agency's own stated interpretation, and is thus preempted. To the extent that the Complaints may be read to allege that the Exchanges undertook self-imposed contractual obligations separate from their regulatory obligations regarding the dissemination of market data, and thus to state a free-standing breach of contract claim, such allegations are wholly conclusory and divorced from the text of the Subscriber Agreements and accordingly fail to state a claim for breach of contract. Finally, to the extent that Lanier seeks to argue that the SEC has misinterpreted the requirements of the Exchange Act or its own regulations, such a claim must first be exhausted before the agency.[11]

---

[11] We do not decide whether the district court would have subject matter jurisdiction over a claim that the SEC has misinterpreted the Exchange Act or the SEC requirements if such a claim were brought *alone* or in direct disagreement

## A.    Preemption

Many of Lanier's claims for breach of contract are nothing more than allegations that the Exchanges have not fulfilled obligations imposed on them by SEC regulations. Conflict preemption arises when a state law conflicts with a federal statute or a regulation promulgated by a federal agency acting within the scope of its congressionally delegated authority. *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 368-69 (1986). "[W]e will find a conflict with preemptive effect only in two circumstances [including] . . . when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 97 (2d Cir. 2013), quoting *Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012). Under those principles, in order to find that Lanier's claims are preempted, we must find both that Lanier's interpretation of what the SEC regulations require,

---

with an agency action. In this case Lanier brought a contract claim over which the district court did have subject matter jurisdiction, and we must consider the merits of his claim in order to determine whether it is subject to prior review by the SEC. Because we do have subject matter jurisdiction over the contract claim, we hold only that to the extent Lanier challenges the SEC's express interpretation of its own regulations, such a claim must be – and was not – exhausted.

and upon which his claims are predicated, conflicts with the SEC's own interpretation of the same regulations; and that Lanier's state law interpretation would impede congressional objectives. We conclude that there is a conflict that would interfere with congressional intent and purposes.

### 1. Conflict

Turning to the issue of whether there is a conflict, we must first assess whether Lanier relies on interpretation of the relevant SEC regulations as opposed to the contractual provisions incorporating the NMS Plans.[12] Each Exchange offers its own standardized subscriber contract, which incorporates the applicable NMS Plan by reference. *See, e.g.*, J.A. 159 ("The undersigned . . . hereby applies . . . to receive . . . current options last sale information and current options quotation information . . . pursuant to a Plan declared effective by the [SEC].") Lanier argues that the Exchanges did not meet their obligations under the Plans to provide data in a fair, nondiscriminatory, and prompt manner and

---

[12] It is unclear whether the NMS Plans – which are approved by the SEC – are "regulations" in and of themselves. Because, as discussed *infra*, we conclude that the NMS Plans are co-extensive with Regulation NMS with respect to the distribution of data, we need not reach that issue.

that by breaching those obligations, they breached their contracts with Subscribers. But the Plans promise nothing more than the SEC regulations require, and thus any state contract interpretation conflicting with the SEC's interpretation of the regulations is subject to preemption.

The NMS Plans all include similar, although not identical, language that requires data to be distributed in a fair and non-discriminatory manner (the "non-discriminatory language").[13] The non-discriminatory language in the NMS

---

[13] The CTA and CQ Plans, which are substantively identical, are used by Appellees NYSE and AMEX. Those Plans provide that each network's administrator shall provide for "fair and reasonable terms and conditions" and the dissemination of network information "on terms that are not unreasonably discriminatory." S.A. 41, 97. The NASDAQ UTP Plan promises that it will collect, consolidate, and disseminate data "in a manner designed to assure the prompt, accurate and reliable collection, processing and dissemination of information," S.A. 141, and the dissemination of data "in a fair and non-discriminatory manner," S.A. 142. The OPRA Plan provides that it "shall provide for the uniform, nondiscriminatory dissemination of consolidated Options Information, on fair and reasonable terms." S.A. 168. We note that Rule 603 of Regulation NMS does not apply to dissemination of options market data under the OPRA Plan because Regulation NMS applies only to "NMS stock," which is defined to exclude options. *See* 17 C.F.R. §§ 242.600(b)(47), 242.603(a). Nonetheless, we see no reason why we should analyze Lanier's claims with respect to the OPRA Plan differently than his claims with respect to the other NMS Plans insofar as the SEC has approved the OPRA Plan, like the NMS Plans, "as a means of facilitating a national market system in accordance with the requirements of Section 11A of

Plans mirrors that of Regulation NMS itself, which requires that the Exchanges distribute information "on terms that are not unreasonably discriminatory." 17 C.F.R. § 242.603(a)(2). "The 'fair and reasonable' and 'not unreasonably discriminatory' requirements in adopted Rule 603(a) are derived from the language of Section 11A(c) of the Exchange Act." Regulation NMS, 70 Fed. Reg. at 37567.

The NMS Plans also include similar, but again not identical, language that requires data to be distributed promptly (the "promptness language").[14] That promise of "promptness" also derives from the SEC regulation, which requires the Exchanges to file with the SEC a plan for approval which includes "[t]he applicable standards and methods which will be utilized to ensure promptness of reporting." 17 C.F.R. § 242.601(a)(2)(v).

the Act." Am. Stock Exch., Inc., Exchange Act Release No. 17638, 22 SEC Docket 484, 1981 WL 36678, at *1 (Mar. 18, 1981).

[14] The CTA Plan requires that the reporting party "report . . . as promptly . . . as practical," S.A. 22, and the CQ Plan requires the Exchanges to "furnish quotation information to the Processor as promptly as possible," S.A. 87. Under the CQ Plan, the Exchanges also agreed to "have as an objective the reduction of the time period for furnishing quotation information to the Processor." S.A. 92. Similarly, in the NASDAQ Subscriber Agreement, NASDAQ states that NASDAQ "shall endeavor to offer the Information as promptly and accurately as is reasonably practicable." J.A. 165 ¶ 9 (15-1693).

Because the non-discriminatory and promptness language of the Plans tracks Regulation NMS almost verbatim, we conclude that the Plans are co-extensive with that regulation with respect to the timing of the delivery of market data. Therefore, allegations that the Exchanges breached the Plans, which are incorporated into the terms of their contracts with Lanier, constitute allegations that the Exchanges breached the relevant regulations. To the extent that Lanier's theory of breach conflicts with the SEC's own interpretation of the relevant regulations and statutory language, his claims are preempted.[15]

Lanier's theory of breach of contract relies on the premise that the relevant SEC regulations require data to be received by the Processor either prior to, or simultaneously with, being received by the Preferred Customers in order to be fair, nondiscriminatory, and prompt. That theory has no support in any of the SEC's statements on the issue. To the contrary, the SEC appears to have interpreted these requirements to mean that data must be *sent* by the Exchanges at the same time, not *received* simultaneously, as Lanier urges. In the Regulation NMS adopting release, the SEC explained:

---

[15] We express no view, however, as to the soundness of the SEC's statements and interpretations at issue here. *See infra* Part II.C.

> Commenters were concerned . . . that the distribution standards would prohibit a market from distributing its data independently on a more timely basis than it makes available the "core data" that is required to be disseminated through a Network processor. . . . Adopted Rule 603(a) will not require a market center to synchronize the delivery of its data to end-users with delivery of data by a Network processor to end-users. Rather, independently distributed data could not be made available on a more timely basis than core data is made available to a Network processor. Stated another way, adopted Rule 603(a) prohibits an SRO or broker-dealer from *transmitting* data to a vendor or user any sooner than it *transmits* the data to a Network processor.[16]

Regulation NMS, 70 Fed. Reg. at 37567 (footnotes omitted) (emphasis added).

That interpretation has been affirmed by later SEC releases and enforcement actions. *See* Concept Release on Equity Market Structure, 75 Fed. Reg. 3594-01, 3611 (Jan. 21, 2010) (hereinafter "Concept Release") ("When it adopted Regulation NMS in 2005, the Commission did not require exchanges . . . to delay

---

[16] "Core data for each NMS security consists of three things: (1) last sale reports, which include the price at which the latest sale of the security occurred, the size of the sale and the exchange where it took place; (2) the current highest bid and lowest offer for the security, along with the number of shares available at those prices, at each exchange; and (3) the 'national best bid and offer,' or NBBO, which are the highest bid and lowest offer currently available in the country and the exchange(s) where those prices are available." *NetCoalition v. SEC*, 615 F.3d 525, 529 (D.C. Cir. 2010). "The terms 'core' and 'non-core' are SEC creations." *Id.* at 529 n.3.

their individual data feeds to synchronize with the distribution of consolidated data, but prohibited them from independently *transmitting* their own data any sooner than they *transmitted* the data to the plan processors."(emphasis added)). Importantly, the SEC has also indicated that "transmit" in this context means "release." *See* N.Y. Stock Exch. LLC, & NYSE Euronext, Exchange Act Release No. 67857, 104 SEC Docket 2455, 2012 WL 4044880, at *8 (Sept. 14, 2012) (explaining that the "[E]xchanges have an obligation under [Regulation NMS] to take reasonable steps to ensure—through system architecture, monitoring, or otherwise—that they *release* data . . . through proprietary feeds no sooner than they *release* data to the [] Processor[s], including during periods of heavy trading" (emphasis added)).[17]

Thus, through interpretive releases and enforcement actions, the SEC appears to have interpreted the non-discriminatory and promptness language

---

[17] The SEC criticized the NYSE for using "internal architecture [that] gave its real-time depth-of-book proprietary feed a path to customers that was faster than the path used to send quotes to the Network Processor. Since the inception of this feed in June 2008, NYSE often made its data available to customers sooner than NYSE *sent* data to the Network Processor." *In re New York Stock Exch,* Release No. 67857 at * 2 (emphasis added). Lanier argues that in this language the SEC "made it clear that the issue is the entire path from Exchange to processor." *See* Appellant's Br. 45. We are not persuaded. Like the portions of the SEC releases we quote above, that language also focuses on when market data is *sent* to a Processor, not when it is received.

used in the NMS Plans to mean that the Exchanges cannot transmit, release, or send information sooner to other users than it sends it to a Processor. In adopting that interpretation, the SEC has also necessarily explained what Regulation NMS does *not* require: that the Processor and other users receive the data prior to, or at the same time as, Preferred Customers.

Further, as Lanier acknowledges, the SEC has approved the Exchanges' use of propriety feeds and co-location services. *See* Concept Release, 75 Fed. Reg. at 3598. In approving those practices, the SEC expressly acknowledged that proprietary feeds and co-location reduce latency, which is the very conduct Lanier claims violates the SEC requirements. *See, e.g.*, Order Approving Proposed Rule Change To Establish Fees for NYSE Trades, 74 Fed. Reg. 13293-01, 13294 & n.7 (Mar. 26, 2009) (approving the NYSE proprietary feed while acknowledging that it was developed "primarily at the request of traders who are very latency sensitive," that the feed would be used by such traders, and that "[t]he latency difference between accessing last sales through the NYSE datafeed or through the CTA [Processor] datafeed can be measured in tens of milliseconds."). In regulating co-location, the SEC acknowledged that "[s]peed matters both in the absolute sense of achieving very small latencies and in the relative sense of being

faster than competitors, even if only by a microsecond," and that "[c]o-location is one means to save micro-seconds of latency." Concept Release, 75 Fed. Reg. at 3610. Nonetheless, the SEC found that co-location services were not inherently unfair and discriminatory.

Lanier's interpretation of the NMS Plans, and consequently Regulation NMS, would require that the Processors receive data prior to or at the same time as the receipt by the Preferred Customers. That interpretation conflicts with the SEC's interpretation and implementation of the same regulations.

### 2. Obstacle to Congressional Objectives

Any interpretation of a contract that would find a breach under state law where the SEC would not find a similar breach of the substantively identical regulations "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d at 97 (internal quotation marks omitted). "Obstacle analysis . . . precludes state law that poses an 'actual conflict' with the overriding federal purpose and objective." *Id.* at 101, quoting *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 162 (2d Cir. 2013). "[T]he purpose of Congress is the ultimate touchstone." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).

36

The intent of Congress in promulgating and amending the Exchange Act and delegating authority to the SEC for regulation of Exchanges was to support a

> national system for the clearance and settlement of securities transactions and the safeguarding of securities and funds related thereto, and to impose requirements necessary to make such regulation and control reasonably complete and effective, in order to protect interstate commerce, the national credit, the Federal taxing power, to protect and make more effective the national banking system and Federal Reserve System, and to insure the maintenance of fair and honest markets in such transactions.

15 U.S.C. § 78b ("Necessity for regulation"). In directing the SEC "to use its authority under this chapter to facilitate the establishment of a national market system for securities," *id.* § 78k-1(a)(2), Congress emphasized that the "securities markets are an important *national* asset which must be preserved and strengthened," *id.* § 78k-1(a)(1)(A) (emphasis added). Congress also made clear that the Exchanges and Processors must follow the rules and regulations of the SEC. *See id.* §§ 78f(b)(1), 78k-1(b)(3).

From the Exchange Act – which focuses on the need to create a *national* market system – we can infer that Congress intended for the regulations governing national securities exchanges and securities information processors to be uniform. Allowing conflicting judicial interpretation of the SEC requirements

37

pursuant to state contract law would stand as an obstacle to the uniformity that Congress intended to create for the national market system. Therefore, to the extent that Lanier alleges that the SEC regulations require data to be *received* by the Processor no later than by any other recipient, Lanier's interpretation conflicts with the SEC's interpretation and would undermine Congress's intent to create uniform rules for governing the national market system. Even uniform state-law interpretations of the regulations that differ from the meaning intended by the SEC would defeat Congress's intent that the SEC, with its expertise in the operation of the securities markets, make the rules regulating those markets. Accordingly, Lanier's conflicting interpretation of the contracts is preempted.[18]

---

[18] Lanier also argues that the district court took improper judicial notice of a book called *Flash Boys* by Michael Lewis (who is not related to Lanier's counsel, who has a similar name), and thus erroneously interpreted his complaint as mirroring an argument allegedly made in the book that it is improper for the Preferred Customers to receive data before it is received by the *subscribers* to the Processor's feed. Although the district court did mention the existence of the book in the opening of its opinion in this case, it did not take judicial notice of the book or rely on the book as evidence. *See* Fed. R. Evid. 201. Moreover, it is clear from the district court's opinion that the court correctly understood the Complaints to allege that the data was received by Preferred Customers before the *Processor*, not simply that the Preferred Customer received the data before the end users who subscribe to Processor feeds. The district court's reference to *Flash Boys* provides no basis for finding error in the district court's opinion. In any event, our own analysis of Lanier's claim has nothing to do with the book and deals exclusively with the claim as presented in the Complaints.

**B.     Failure to Allege a Breach of Contract**

In theory, a breach of contract claim premised on failure to fulfill contractual obligations independent of the obligations imposed by a regulatory scheme could be brought against the Exchanges in federal court.[19] *See, e.g.,* *Wolens*, 513 U.S. at 228 (noting that the regulatory scheme did not "shelter airlines from suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings"). Nonetheless, to the extent that the Complaints can be construed to assert a claim based on contract terms *other than* the terms of the incorporated-by-reference regulations, they still fail to state a claim for breach of contract.

Any contention that Preferred Customers may not *receive* the unconsolidated data prior to the Processor has no basis in the terms of the Subscriber Agreements. Lanier identifies no language in the Subscriber Agreements that makes any promise as to the timing of the *receipt* of unconsolidated data by the Processor, the subscribers, or the Preferred Customers. *Cf. United Steelworkers of Am., AFL-CIO-CLC v. Rawson*, 495 U.S. 362, 374 (1990) ("If an employee claims that a union owes him a more far-reaching

---

[19] Assuming, of course, that the Exchanges are not immune from Lanier's suit, an issue that we do not reach in this appeal.

duty [than imposed by federal law], he must be able to point to language in the collective-bargaining agreement specifically indicating an intent to create obligations enforceable against the union by the individual employees."). Rather, Lanier points to language in the NMS Plans and Regulation NMS requiring fair, nondiscriminatory, and prompt distribution of data through a single plan processor, which, as we have explained, the SEC has interpreted to impose requirements on when data is *sent* to different customers, not when it is received.[20]

Lanier further argues that an obligation to ensure that market information is received by the Processor simultaneously with its receipt by the Preferred Customers may be inferred because "[i]n a contract for delivery of perishable products, the parties must choose a relevant time and place at which to judge contract performance," and "[i]n this case, the relevant time is the microsecond the market data arrives at the relevant place, the input jacks of the Processor." Appellant's Br. 35. But such an inference cannot be drawn from the language of

---

[20] To the extent that the NMS Plans themselves may be considered a voluntary undertaking of an obligation separate from the regulatory requirements – because the Exchanges create the Plans and submit the Plans to the SEC for approval – the Plans, as discussed previously, are co-extensive with Regulation NMS with respect to the timing of data delivery.

the contracts, which require only that the Exchanges deliver data in a manner consistent with the Plans, and indeed disclaim liability for the untimely delivery of data.[21] That is all the more clear because Lanier's interpretation of the word "delivery" conflicts with the agency's own interpretation.

Similarly, Lanier's contention that the Subscriber Agreements include a promise that the Processor will be the "single source" of the NBBO, Appellant's Br. 42, is wholly conclusory and is not supported by the text of the agreements. The only support Lanier provides for this allegation is the NMS Adopting Release, which emphasized that "[o]ne of the strengths of the U.S. equity markets and the NMS is that the trading interests of all types and sizes of investors are integrated, to the greatest extent possible, into a unified market system." Regulation NMS, 70 Fed. Reg. at 37511. Because no factual allegations in the Complaints support Lanier's contention that the Exchanges contracted in the Subscriber Agreements to provide the NBBO only through a single source (the Processor), the Complaints fail to state a claim for breach of any such obligation.

---

[21] The sole exception to this statement is the NASDAQ contract, which provides in its disclaimer that "NASDAQ shall endeavor to offer the Information as promptly and accurately as is reasonably practicable." J.A. 165 (15-1693). Under ordinary rules of contract interpretation, that provision, in the circumstances presented here, cannot be read as imposing an obligation on NASDAQ to ensure that the Processor receives data at the same time as the Preferred Customers.

As Lanier has failed to identify any contractual promise *independent* of the relevant regulations that was breached by the prior receipt of data by Preferred Customers, he has failed to state a claim for breach of contract.

**C.    Exhaustion**

Finally, to the extent that the Complaints may also be read to allege a breach of contract theory that assumes that the implementation or operation of the NMS Plans violates the Exchange Act, any such claim must first be administratively exhausted before the SEC.

"Under the exhaustion rule, a party may not seek federal judicial review of an adverse administrative determination until the party has first sought all possible relief within the agency itself." *Guitard v. U.S. Sec'y of Navy*, 967 F.2d 737, 740 (2d Cir. 1992). The exhaustion rule "is based on the need to allow agencies to develop the facts, to apply the law in which they are peculiarly expert, and to correct their own errors. The rule ensures that whatever judicial review is available will be informed and narrowed by the agencies' own decisions." *Schlesinger v. Councilman*, 420 U.S. 738, 756 (1975).

If Lanier believes that the implementation or operation of the NMS Plans is inconsistent with his interest he must first seek all possible relief in the SEC.

42

Lanier has failed to do so. As the Exchanges concede, Lanier remains free to bring his concerns to the attention of the agency. *See* Appellees' Br. 32 ("Lanier's central theory is that the Exchanges violated Regulation NMS and the NMS Plans. . . . [T]he SEC has authority to adjudicate these allegations."). Regulation NMS provides that the SEC can "entertain appeals in connection with the implementation or operation of any effective national market system plan" and "[a]ny action taken or failure to act by any person in connection with an effective national market system plan . . . shall be subject to review by the [SEC], on its own motion or upon application by any person aggrieved thereby." 17 C.F.R. § 242.608(d). In the proceedings for review, the SEC makes its determination by "order," *id* § 242.608(d)(3), which, once final, may be reviewed in the court of appeals. 15 U.S.C. § 78y(a)(1).[22]

Lanier has the right to seek review before the SEC of any claim that the Exchanges have failed to appropriately operate or implement their NMS Plans. He has not done so, and accordingly any such claim is not ripe for our review.

---

[22] Lanier argues that exhaustion is not required where the SEC offers no meaningful relief. That argument, however, assumes that his claims are free-standing breach of contract claims. As discussed *supra*, to the extent that his Complaints may be construed as alleging such a claim, they fail on the merits.

43

## CONCLUSION

We have considered all of Lanier's other arguments and find them to be without merit. The district court's dismissal of all three cases is therefore **AFFIRMED.**