**15-3057-cv**
*City of Providence, et al. v. BATS Global Markets, Inc., et al.*

# In the

# United States Court of Appeals

## For the Second Circuit

————

AUGUST TERM, 2016
ARGUED: AUGUST 24, 2016
DECIDED: DECEMBER 19, 2017

No. 15-3057-cv

CITY OF PROVIDENCE, RHODE ISLAND, EMPLOYEES' RETIREMENT
SYSTEM OF THE GOVERNMENT OF THE VIRGIN ISLANDS, PLUMBERS AND
PIPEFITTERS NATIONAL PENSION FUND,
*Lead Plaintiffs-Appellants*,

STATE-BOSTON RETIREMENT SYSTEM,
*Plaintiff-Appellant*,

GREAT PACIFIC SECURITIES,
on Behalf of Itself and All Others Similarly Situated,
*Plaintiff*,

AMERICAN EUROPEAN INSURANCE COMPANY, JAMES J. FLYNN, HAREL
INSURANCE COMPANY LTD., DOMINIC A. MORELLI,
*Consolidated-Plaintiffs*,

*v.*

BATS GLOBAL MARKETS, INC., CHICAGO STOCK EXCHANGE INC.,
DIRECT EDGE ECN, LLC, NYSE ARCA, INC., NASDAQ OMX BX INC.,
NEW YORK STOCK EXCHANGE LLC, NASDAQ STOCK MARKET, LLC,
*Defendants-Appellees*,

BARCLAYS CAPITAL INC., BARCLAYS PLC, AND DOES, 1-5, INCLUSIVE,

*Defendants.*[1]

————

Appeal from the United States District Court
for the Southern District of New York.
Nos. 14-md-2589, 14-cv-2811 – Jesse M. Furman, *Judge*.

————

Before: WALKER, CABRANES, AND LOHIER, *Circuit Judges*.

————

We consider in this class action whether plaintiffs have sufficiently pled that several national securities exchanges engaged in manipulative or deceptive conduct in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5. The lead plaintiffs, institutional investors who traded on the defendant stock exchanges during the class period, allege that the exchanges misled them about certain products and services that the exchanges sold to high-frequency trading firms, which purportedly created a two-tiered system that favored those firms at the plaintiffs' expense. We conclude that we have subject matter jurisdiction over this case, the defendant exchanges are not entitled to absolute immunity, and the district court erred in dismissing the complaint under Federal Rule of Civil Procedure 12(b)(6). We therefore VACATE the district court's

---

[1] The Clerk of Court is respectfully directed to amend the caption as above.

judgment entered in favor of the defendants-appellees and REMAND for proceedings consistent with this opinion.

Judge LOHIER concurs in the judgment and in the opinion of the Court and files a separate concurring opinion.

————

JOSEPH D. DALEY (Andrew J. Brown, David W. Mitchell, Samuel H. Rudman, Patrick J. Coughlin, Vincent M. Serra, *on the brief*), Robbins Geller Rudman & Dowd LLP, San Diego, CA and Melville, NY; Joseph F. Rice, William H. Narwold, Ann K. Ritter, David P. Abel, Donald A. Migliori, Rebecca Katz, Motley Rice LLC, Mount Pleasant, SC and New York, NY; Christopher J. Keller, Joel H. Bernstein, Michael W. Stocker, Labaton Sucharow LLP, New York, NY *for Lead Plaintiffs-Appellants*.

DOUGLAS R. COX (Scott P. Martin, Michael R. Huston, Alex Gesch, Rajiv Mohan, *on the brief*), Gibson, Dunn & Crutcher LLP, Washington, DC *for Defendants-Appellees NASDAQ OMX BX Inc. and Nasdaq Stock Market, LLC*; Douglas W. Henkin, J. Mark Little, Baker Botts LLP, New York, NY and Houston, TX *for Defendants-Appellees New York Stock Exchange LLC and NYSE Arca, Inc.*; Seth L. Levine, Christos G. Papapetrou, Levine Lee LLP, New York, NY *for Defendant-Appellee Chicago Stock Exchange Inc.*; James A. Murphy, Theodore R. Snyder, Joseph Lombard, Murphy & McGonigle, P.C., New York, NY and Washington, DC *for Defendants-Appellees BATS Global Markets, Inc. and Direct Edge ECN, LLC*.

Sanket J. Bulsara, Deputy General Counsel, Michael A. Conley, Solicitor, Dominick V. Freda, Assistant General Counsel, Jacob R. Loshin, Securities and Exchange Commission Washington, DC, *for amicus curiae Securities and Exchange Commission*.

————

JOHN M. WALKER, JR., *Circuit Judge*:

We consider in this class action whether plaintiffs have sufficiently pled that several national securities exchanges engaged in manipulative or deceptive conduct in violation of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5. The lead plaintiffs, institutional investors who traded on the defendant stock exchanges during the class period, allege that the exchanges misled them about certain products and services that the exchanges sold to high-frequency trading ("HFT") firms, which purportedly created a two-tiered system that favored those firms at the plaintiffs' expense. We conclude that we have subject matter jurisdiction over this case, the defendant exchanges are not entitled to absolute immunity, and the district court erred in dismissing the complaint under Federal Rule of Civil Procedure 12(b)(6). We therefore VACATE the district court's judgment entered in favor of the defendants-appellees and REMAND for proceedings consistent with this opinion.

**BACKGROUND**

The lead plaintiffs filed this class action for securities fraud against seven national securities exchanges (collectively, "the exchanges"), including BATS Global Markets, Inc., the Chicago Stock Exchange Inc., the Nasdaq Stock Market, LLC, and the New York Stock Exchange LLC ("NYSE").[2] The exchanges are all registered with the SEC as self-regulatory organizations ("SROs")—non-governmental entities that function both as regulators and regulated entities. As regulated entities, they are subject to SEC oversight and must comply with the securities laws as well as the exchanges' own rules; and as regulators, they are delegated the authority by the SEC to oversee and discipline their member broker-dealers. *See* 15 U.S.C. § 78c(a)(26); *id.* § 78f(b)(1); *see also* S. Rep. No. 94-75 (1975), *reprinted in* 1975 U.S.C.C.A.N. 179, 1975 WL 12347, at *23.

The complaint alleges that the defendant exchanges manipulated market activity in their capacities as regulated entities, in violation of § 10(b) and Rule 10b-5. In particular, plaintiffs contend that the exchanges developed products and services that give HFT firms trading advantages over non-HFT firms and the investing public, sold those products and services at prices that ordinary

---

[2] Two alternative trading venue entities, Barclays PLC and its subsidiary, Barclays Capital Inc., were also defendants in this action, but they are not parties to this appeal.

investors could not afford, and failed to publicly disclose the full or cumulative effects that the products and services have on the market.

## I.    National Securities Exchanges

Prior to 1975, the national securities exchanges operated independently from one another such that stocks listed on one registered exchange might trade at a different price on a different exchange. To mitigate this problem, Congress amended the Exchange Act in 1975 to mandate the creation of a unified "national market system" ("NMS"). *See* 15 U.S.C. § 78k-1(a). Congress conferred on the SEC broad authority to oversee the SROs' "planning, developing, operating, or regulating" of the national market system. *Id.* § 78k-1(a)(3)(B).

The SEC then promulgated a series of regulations, culminating in 2005 with Regulation NMS, "to modernize and strengthen the national market system . . . for equity securities." Regulation NMS, 70 Fed. Reg. 37,496, 37,496 (June 29, 2005) (codified at 17 C.F.R. § 242.600 *et seq.*) [hereinafter "Regulation NMS"]). The SEC emphasized that a national market system must "meet the needs of longer-term investors" because any other outcome would be "contrary to the Exchange Act and its objectives of promoting fair and efficient markets that serve the public interest." *Id.* at 37,500 (noting the Exchange Act's "core concern for the welfare of long-term investors who depend on equity investments to meet their financial

goals"). The SEC distinguished such long-term investors from short-term speculators who hold stock "for a few seconds." *Id.* In furtherance of these objectives, the SEC required that the exchanges distribute core market data on "terms that are fair and reasonable" and "not unreasonably discriminatory." 17 C.F.R. § 242.603(a)(1), (2). The SEC also required that exchanges and brokers accept the most competitive "bid" or "offer" price posted at any trading venue, to ensure that investors would receive the best prices, and that the exchanges inform the investing public of the national best "bid" and "offer" price by displaying it on their consolidated data feeds. *See id.* §§ 242.601-603.

## II.    High Frequency Trading Firms

In the years following the SEC's promulgation of Regulation NMS, the use of high-frequency trading rose dramatically in the U.S. stock markets. According to the plaintiffs, HFT firm transactions now account for nearly three-quarters of the exchanges' equity trading volume. HFT firms, using sophisticated, computer-driven algorithms to move in and out of stock positions within fractions of a second, make money by arbitraging small differences in stock prices rather than by holding the stocks for long periods of time. The firms employ various trading strategies that rely on their ability to process and respond to market information more rapidly than other users on the exchanges. Relevant to this appeal, the plaintiffs allege that the firms

engage in predatory practices, such as repeatedly "front-running" other market participants: anticipating when a large investment of a given security is about to be made, purchasing shares of the security in advance of the investment, and then selling those shares to the buying investors at slightly increased prices.

### III.  Proprietary Data Feeds, Co-Location Services, and Complex Order Types

The defendant exchanges in this case operate as for-profit enterprises that generate most of their revenue from the fees they charge for trades and the sale of market data and related services for those trades.  The exchanges compete with one another to increase the trading volume on their particular exchanges.  Plaintiffs contend in this case that the exchanges created three products and services for "favored" HFT firms—proprietary data feeds, co-location services, and complex order types—to provide these firms with more data at a faster rate than the investing public and thereby to attract HFT firms to trade on their exchanges.

#### a.  Proprietary Data Feeds

Under Regulation NMS, each exchange must transmit certain information concerning trades on that exchange to a central network where the information is consolidated and then distributed.  17 C.F.R. § 242.603.  This consolidated data feed provides basic real-time trading information, such as the national best bid and offer for a given

stock. At issue in this case is the exchanges' provision to firms of additional, costly proprietary data feeds that include more detailed information regarding trading activity. At the most detailed and expensive level, a proprietary data feed may provide data on every bid and order for a given stock on an exchange. Furthermore, although the exchanges are prohibited from *releasing* data on the proprietary feeds earlier than the data on the consolidated feed, *see* Regulation NMS, at 37,567, the proprietary data generally reach market participants faster because, unlike the consolidated data, they do not need to be aggregated. *See* Regulation NMS, 70 Fed. Reg. at 37,567.

The SEC has "authoriz[ed] the independent distribution of market data outside of what is required by the [NMS] Plans," so long as such distribution is "fair and reasonable" and "not unreasonably discriminatory." *Id.* at 37,566-67. Applying this standard, the SEC has approved various exchanges' proposals to offer proprietary feeds. *See, e.g.,* Self-Regulatory Organizations; New York Stock Exchange LLC; Order Approving Proposed Rule Change to Establish Fees for NYSE Trades, 74 Fed. Reg. 13,293 (Mar. 26, 2009). At the same time, it has instituted enforcement proceedings against exchanges for providing proprietary data feeds that are not in compliance with SEC rules. *See, e.g., N.Y. Stock Exch. LLC*, Exchange Act Release No. 34-

67857, 104 SEC Docket 2455, 2012 WL 4044880 (Sept. 14, 2012) (settled action).

According to plaintiffs, because these proprietary feeds are cost prohibitive for ordinary investors like plaintiffs, HFT firms receive more information at a faster rate and so are able trade on information earlier, which allows them to successfully "front-run" other market participants. Plaintiffs allege that, as a result, ordinary investors are greatly disadvantaged.

### b. Co-Location Services

Some exchanges also rent space to investors to allow them to place their computer servers in close physical proximity to the exchanges' systems. This proximity helps to reduce the "latency" period—the amount of time that elapses between when a signal is sent to trade a stock and a trading venue's receipt of that signal. As with proprietary feeds, the SEC also regulates co-location services. Under the Exchange Act, the terms of co-location services must not be unfairly discriminatory and the fees must be equitably allocated and reasonable. *See* 15 U.S.C. § 78f(b)(4), (5). The SEC has approved the terms of particular co-location services as consistent with the Exchange Act, *see, e.g., Self-Regulatory Organizations; the Nasdaq Stock Mkt. LLC; Order Approving a Proposed Rule Change to Codify Prices for Co-Location Servs.,* Exchange Act Release No. 34-62397, 98 SEC Docket 2621, 2010 WL 2589819 (June 28, 2010), while also taking enforcement

actions against exchanges for providing such services in violation of the Exchange Act, *see, e.g.*, *N.Y. Stock Exch. LLC*, Exchange Act Release No. 34-72065, 108 SEC Docket 3659, 2014 WL 1712113 (May 1, 2014).

Plaintiffs allege that co-location services are especially attractive to HFT firms, whose trading involves frequent buying and selling in short periods of time, and that such services are cost-prohibitive for most ordinary investors. According to plaintiffs, when co-location services are used in combination with proprietary data feeds or complex order types (or both), co-location services amount to a manipulative device because they allow HFT firms to access and trade on information before it becomes publicly available.

c. *Complex Order Types*

The third product at issue in this case is complex order types: pre-programmed, electronic commands that traders use to instruct the exchanges on how to handle their bids and offers under certain conditions. These commands govern the manner in which the exchanges process orders in their trading systems, route orders to other exchanges, and execute trades. Concept Release on Equity Market Structure, 75 Fed. Reg. 3,594, 3,598 (Jan. 21, 2010).

As with co-location services and proprietary data feeds, the SEC regulates complex order types, but it also has instituted enforcement proceedings against the exchanges for providing certain complex orders. The SEC, for example, brought an action against an

exchange for providing order types that functioned differently from the descriptions that the exchange filed with the SEC and for selectively disclosing an order type's functionality only to certain HFT firms. *EDGA Exch., Inc.*, Exchange Act Release No. 34-74032, 110 SEC Docket 3510, 2015 WL 137640 (Jan. 12, 2015) (settled action).

Plaintiffs allege that the defendant exchanges developed several fraudulent and deceptive complex order types to benefit HFT firms at the expense of the plaintiffs. For instance, according to the plaintiffs, the exchanges have created "hide and light" orders that allow traders to place orders that remain hidden from the ordinary bid-and-offer listings on an individual exchange until a stock reaches a particular price, at which point the hidden orders emerge and jump the queue ahead of other investors' orders. Plaintiffs also argue, and the exchanges dispute, that certain exchanges have not adequately disclosed the full functionality of these order types to all market participants. According to plaintiffs, this selective disclosure has caused harm to ordinary investors including, among other things, increased opportunity costs from unexecuted fill orders, adverse selection and price movement bias on executed fill orders, and increased execution costs.

**IV.   Procedural History**

On April 18, 2014, the City of Providence filed a putative class action against the exchanges under §§ 6(b) and 10(b) of the Exchange

Act and SEC Rule 10b-5.[3]  The district court consolidated the action with several related cases and appointed several institutional investors as lead plaintiffs.  On January 12, 2015, the Judicial Panel on Multidistrict Litigation combined this consolidated action with other similar cases.

The exchanges then moved to dismiss the plaintiffs' complaint, arguing that (1) the district court lacked jurisdiction; (2) the exchanges were absolutely immune from suit; and (3) the plaintiffs had failed to state a claim under the Exchange Act.  On August 26, 2015, the district court determined that it had subject matter jurisdiction over this case.  It held that the exchanges were absolutely immune from plaintiffs' allegations concerning the proprietary data feeds and complex order types, but not co-location services.  The district court further concluded that, even if the exchanges were not absolutely immune, the plaintiffs had failed to state a claim for a violation of § 10(b) and Rule 10b-5 based on a manipulative scheme. The district court therefore granted the exchanges' motion and dismissed the complaint.  Plaintiffs timely filed this appeal.

---

[3] The district court dismissed plaintiffs' claims under § 6(b) of the Exchange Act on the basis that § 6(b) does not provide for a private cause of action.   Because plaintiffs do not challenge this determination, we do not address it on appeal.

**DISCUSSION**

As we will explain, we conclude that we have subject matter jurisdiction over this action and that the defendants are not immune from suit. We further conclude that the district court erred in dismissing plaintiffs' complaint for failure to state a claim.

**I.        Subject Matter Jurisdiction**

When a district court has determined that it has subject matter jurisdiction over an action, as is the case here, we review the district court's factual findings for clear error and its legal conclusions *de novo*. *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 193 (2d Cir. 2003). A plaintiff must affirmatively demonstrate jurisdiction, and "that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2009) (internal quotation marks and citation omitted).

The defendants argue that, because the subject matter at issue is within the SEC's regulatory purview, the district court lacked jurisdiction. A district court lacks subject matter jurisdiction to hear claims "where Congress creates a comprehensive regulatory scheme from which it is fairly discernible that Congress intended that agency expertise would be brought to bear prior to any court review." *Lanier v. Bats Exch., Inc.*, 838 F.3d 139, 146 (2d Cir. 2016). This involves a two-step analysis. First, we must determine whether it is "fairly

discernible from the text, structure, and purpose of the securities laws that Congress intended the SEC's scheme of administrative and judicial review to preclude district court jurisdiction." *Tilton v. SEC*, 824 F.3d 276, 281 (2d Cir. 2016) (internal quotation marks and citation omitted). Second, if we conclude that the SEC's scheme precludes district court jurisdiction, we must then decide if the appellants' claim is "of the type Congress intended to be reviewed within the statutory structure." *Id.* (citation and alteration omitted).

Plainly, Congress created a detailed scheme of administrative and judicial review for challenges to certain actions of SROs. For example, a party who objects to an SRO's disciplinary action or rule must raise its objection under the exclusive review scheme Congress devised for such challenges and not in an action in district court. *See* 15 U.S.C. §§ 78s(d)(2), 78y; *see also Tilton*, 824 F.3d at 281-82; *Feins v. Am. Stock Exch., Inc.*, 81 F.3d 1215, 1220 (2d Cir. 1996).

We do not think, however, that Congress intended for the SEC to adjudicate claims such as the ones at issue here—a private cause of action for fraud under § 10(b) and Rule 10b-5. *Cf. Lanier*, 838 F.3d at 148 ("[T]he Exchange Act demonstrates no intention to establish an administrative process for the SEC to adjudicate private contract disputes."). The defendants do not point to any language in the Exchange Act that evidences such an intention. Our interpretation of the Exchange Act in this case would not interfere with the

administrative process because "meritorious private actions to enforce federal antifraud securities laws are an essential supplement to . . . civil enforcement actions" brought or adjudicated by the SEC. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

The defendant exchanges respond that, notwithstanding plaintiffs' characterization of their claims as for securities fraud under § 10(b) and Rule 10b-5, plaintiffs are actually challenging the SEC's determination that proprietary data feeds, co-location services, and complex order types are consistent with the Exchange Act and Regulation NMS. According to the defendant exchanges, such a challenge must be resolved by the SEC in the first instance with review in a federal court of appeals. The defendant exchanges point to a specific review procedure, NMS Rule 608(d), 17 C.F.R. § 242.608(d), as depriving the district court of jurisdiction to hear the plaintiffs' claims.

This argument is unpersuasive for several reasons. As an initial matter, NMS Rule 608(d) allows the SEC to "entertain appeals in connection with the implementation or operation of any effective national market system plan." 17 C.F.R. § 242.608(d). Plaintiffs challenge particular actions taken by the defendants individually and not as part of a "national market system plan" that enables joint action by multiple exchanges. *See id.*

More fundamentally, the exchanges mischaracterize the plaintiffs' allegations. The plaintiffs do not challenge the SEC's authority or decision to generally approve these products or services as inconsistent with the Exchange Act or Regulation NMS. *See, e.g.*, Regulation NMS, 70 Fed. Reg. at 37,567 (authorizing "the independent distribution of market data outside of what is required by the [NMS] Plans," so long as such distribution is "fair and reasonable" and "not unreasonably discriminatory" (internal quotation marks omitted)). The plaintiffs instead claim that, with respect to specific proprietary data feeds, co-location services, and complex order types, the exchanges engaged in fraudulent, manipulative conduct. In particular, the plaintiffs allege that the exchanges created products and services to give HFT firms trading advantages, the exchanges sold these products and services at prices that were cost-prohibitive to ordinary investors, and the exchanges failed to disclose the full capabilities of these products and services to the investing public.

Thus, according to plaintiffs, the exchanges purposefully gave HFT firms the ability to trade on more detailed information at a faster rate than the investing public, including the plaintiffs. The plaintiffs were kept "[i]n ignorance of the true facts and the illegal practices of [d]efendants," and the plaintiffs would not have traded to their disadvantage if they had "known of the truth concerning Defendants'

illegal practices." App'x at 358. We agree with the district court that such claims are not a challenge to the SEC's general authority or an attack on the structure of the national securities market. Instead, they are properly characterized as allegations of securities fraud against the exchanges that belong to that ordinary set of "suits in equity and actions at law brought to enforce any liability or duty created by [the Exchange Act] or the rules and regulations thereunder" over which the district courts have jurisdiction. 15 U.S.C. § 78aa(a).

## II.     Absolute Immunity

Because we agree with the district court that it had subject matter jurisdiction over this action, we now consider whether the defendant exchanges are immune from plaintiffs' claims. The district court held that the exchanges were immune from suit with respect to their conduct pertaining to proprietary data feeds and complex order types, but not co-location services. We review *de novo* a district court's determination concerning whether absolute immunity applies. *See State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 82 (2d Cir. 2007).

Absolute immunity affords government officials, and those delegated governmental power such as the defendant exchanges, the ability to exercise their official powers "without fear that their discretionary decisions may engender endless litigation." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 97 (2d Cir. 2007). An SRO and its

officers are entitled to absolute immunity when they are, in effect, "acting under the aegis" of their regulatory duties. *DL Capital Grp. v. Nasdaq Stock Mkt., Inc.*, 409 F.3d 93, 97 (2d Cir. 2005) (internal quotation marks omitted). In such cases, absolute immunity from liability "defeats a suit at the outset" and a plaintiff is barred from litigating an action for a purported injury. *Imbler v. Pachtman*, 424 U.S. 409, 419 n.13 (1976). Given the significance of this protection, we have noted that absolute immunity is of a "rare and exceptional character," *Barrett v. United States*, 798 F.2d 565, 571 (2d Cir. 1986) (internal quotation marks omitted), and we examine whether immunity applies "on a case-by-case basis," *NYSE Specialists*, 503 F.3d at 96. "[T]he party asserting immunity bears the burden of demonstrating its entitlement to it." *Id.*

We have previously concluded that an SRO is entitled to immunity when it "stands in the shoes of the SEC" and "engages in conduct consistent with the quasi-governmental powers delegated to it pursuant to the Exchange Act and the regulations and rules promulgated thereunder." *D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 105-06 (2d Cir. 2001); *see also Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 637 F.3d 112, 115 (2d Cir. 2011) ("There is no question that an SRO and its officers are entitled to absolute immunity from private damages suits in connection with the discharge of their regulatory responsibilities."); *NYSE Specialists*, 503 F.3d at 96 ("[S]o

long as the 'alleged misconduct falls within the scope of the quasi-governmental powers delegated to the [SRO],' absolute immunity attaches." (quoting *D'Alessio*, 258 F.3d at 106)).

We have not explicitly defined the SROs' "quasi-governmental powers" for which they are afforded immunity and, instead, have examined the applicability of the immunity doctrine "on a case-by-case basis." *See NYSE Specialists*, 503 F.3d at 96. We have determined that SROs are entitled to absolutely immunity in at least six contexts: (1) disciplinary proceedings against exchange members; (2) the enforcement of security-related rules and regulations and general regulatory oversight over exchange members; (3) the interpretation of the securities laws and regulations as applied to the exchange or its members; (4) the referral of exchange members to the SEC and other government agencies for civil enforcement or criminal prosecution under the securities laws; (5) the public announcement of an SRO's cancellation of trades; and (6) an amendment of an SRO's bylaws where the amendments are "inextricabl[y]" intertwined with the SRO's role as a regulator. *See Standard Inv. Chartered*, 637 F.3d at 116. This list is not an exclusive one, but it is illustrative of circumstances in which the SRO is exercising its "quasi-governmental powers" that require immunity if the SRO is to be free of harassing litigation. In all of these situations, the SRO is fulfilling its regulatory role and is not

acting as a regulated entity.  Absolute immunity is available to an SRO therefore only when it carries out regulatory functions.

Here, the plaintiffs' claims do not involve any exchange conduct that we could properly characterize as regulatory.  We agree with the exchanges and the district court that disseminating market data is a critical function for which exchanges have various responsibilities under Regulation NMS and, more generally, that the exchanges have numerous obligations to ensure fair and orderly securities markets.  But the provision of co-location services and proprietary data feeds does not relate to the exchanges' regulatory function and does not implicate the SROs' need for immunity.  Similarly, as the exchanges concede, complex order types are "preprogrammed commands *traders* use to tell the *Exchanges* how to handle their bids and offers"—not regulatory commands by the exchanges compelling traders to behave in certain ways.  Appellees' Br. at 13 (emphasis added).

The exchanges contend that dismissing their claim of absolute immunity is inconsistent with two of our previous cases in which we concluded that immunity attached to certain SRO functions that involved trading on the markets and operation of the markets, rather than direct regulation of the SROs' members:[4] *DL Capital Group*, 409

---

[4] In its amicus brief, the SEC contends that immunity should apply only when an SRO is acting as a regulator of its members.  Because we conclude

F.3d 93, and *In re NYSE Specialists Securities Litigation*, 503 F.3d at 97. We disagree. In *DL Capital Group*, an investor filed suit against the Nasdaq Stock Market based on the timing of Nasdaq's public announcement that it was going to cancel certain trades of a listed company. 409 F.3d at 96, 98. We concluded that Nasdaq was immune from suit because "[w]ithout the capacity to make announcements, [SROs] would be stripped of a critical and necessary part of their regulatory powers . . . namely, the power to inform the public of those actions it has undertaken in the interest of maintaining a fair and orderly market or protecting investors and the public interest." *Id.* at 98 (internal quotation marks and citations omitted) (first alteration in original). Plainly, in *D&L Capital Group*, Nasdaq was acting in its capacity as a quasi-governmental regulator, irrespective of whether it was operating as a regulator of its members. It therefore was entitled to immunity.

Similarly, in *In re NYSE Specialists Securities Litigation*, investors filed class actions alleging that the NYSE had failed to adequately monitor and police several of its member floor-trading firms. 503 F.3d at 96-97. The NYSE had charged those firms with managing specific stocks and had promulgated internal rules governing the firms'

---

that plaintiffs have adequately pled that the activity engaged in by the exchanges here was not regulatory under any sense, we need not directly address this contention.

conduct. *Id.* at 92. The plaintiffs alleged *inter alia* that the "NYSE deliberately failed to halt, expose or discipline the illegal trading practices of member firms to the extent necessary to deter, stop or prevent them." *Id.* at 99 (internal quotation marks and alterations omitted). The plaintiffs further alleged that the NYSE knowingly permitted or actively encouraged the firms to submit doctored regulatory reports and alerted the firms to impending internal investigations so that those firms could conceal evidence of wrongdoing. *Id.* at 100. We concluded that, just as an SRO is entitled to absolute immunity for initiating disciplinary action against a member firm, it is also immune from suit if it decides not to take such disciplinary actions. *Id.* at 96. We further determined that the NYSE was immune from the plaintiffs' claims concerning the regulatory reports and internal investigations because these allegations concerned the exchange's functions in its "supervisory" and oversight role. *Id.* at 100.

Here, the plaintiffs' claims do not involve such conduct—they do not allege that the exchanges inadequately responded to, monitored, or policed their members' actions. Instead, the plaintiffs challenge exchange actions that are wholly divorced from the exchanges' role as regulators. Plaintiffs allege that the exchanges violated § 10(b) and Rule 10b-5 when they intentionally created,

promoted, and sold specific services that catered to HFT firms and disadvantaged investors who could not afford those services.

When an exchange engages in conduct to operate its own market that is distinct from its oversight role, it is acting as a *regulated* entity—not a *regulator*. Although the latter warrants immunity, the former does not. Accordingly, we conclude that the exchanges, in providing these challenged products and services, did not "effectively stand in the shoes of the SEC" and therefore are not entitled to the same protections of immunity that would otherwise be afforded to the SEC. *DL Capital Grp.*, 409 F.3d at 95 (internal quotation marks and alteration omitted).

### III.    Failure to State a Claim

Finally, we disagree with the district court's dismissal of this action under Rule 12(b)(6) for failure to state a claim. We review such a determination *de novo*, accepting as true all factual allegations in the complaint and drawing all reasonable inferences in favor of the non-moving party. *Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 591-92 (2d Cir. 2007).

Plaintiffs allege in this case that the exchanges violated § 10(b) and Rule 10b-5. Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device or contrivance in contravention of . . . [the SEC's] rules and regulations." 15 U.S.C. § 78j(b). Rule 10b-5,

which was promulgated by the SEC, makes it unlawful for any person directly or indirectly in connection with the purchase or sale of any security to "employ any device, scheme, or artifice to defraud," "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading," or "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. § 240.10b-5(a)-(c).

Although the Exchange Act does not expressly provide for a private cause of action for § 10(b) violations, ever since our decision in *Fischman v. Raytheon Manufacturing Company*, we have held that § 10(b) provides such an implied right.  188 F.2d 783, 787 & n.4 (2d Cir. 1951); *see also Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157, 164-65 (2008).); *GE Inv'rs v. Gen. Elec. Co.*, 447 F. App'x 229, 231 (2d Cir. 2011).  In an action under § 10(b), a private plaintiff must set forth, "to the extent possible, what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007) (internal quotation marks and citation omitted).  Here, the district court determined that the plaintiffs failed to sufficiently allege that the exchanges (1) engaged in acts that manipulated market activity and (2) committed "primary"

violations of § 10(b) for which they could be held liable.  We address each of these determinations in turn.

*a.  Manipulative Acts*

Plaintiffs first argue that they have sufficiently alleged that the exchanges engaged in manipulative conduct because the complaint specifies what manipulative acts were performed, when they took place, which defendants performed them, and their effect on the market.  We agree.  The complaint sufficiently alleges conduct that "can be fairly viewed as 'manipulative or deceptive' within the meaning of the [Exchange Act]."  *Santa Fe Indus. v. Green*, 430 U.S. 462, 474 (1977).

Although manipulative conduct under § 10(b) and Rule 10b-5 is "virtually a term of art when used in connection with securities markets," it "refers generally to practices . . . that are intended to mislead investors by artificially affecting market activity."  *Id.* at 476 (citation omitted).  The gravamen of such a claim is the "deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators."  *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999).

Here, plaintiffs allege that the defendant exchanges created products and services for HFT firms that illicitly "rigged the market" in the firms' favor in exchange for hundreds of millions of dollars in

fees. App'x at 225. According to plaintiffs, these products and services provided HFT firms with the ability to access market data at a faster rate, obtain non-public information, and take priority over ordinary investors' trades. Plaintiffs further allege that the exchanges failed to disclose the full impact that such products and services would have on market activity and knowingly created a false appearance of market liquidity that, unbeknownst to plaintiffs, resulted in their bids and orders not being filled at the best available prices.

For example, as we have already noted, plaintiffs allege that the exchanges, without adequate disclosure, used a certain type of complex order that allowed HFT firms to place orders that remained hidden on an individual exchange until a stock reached a certain price, at which point the previously hidden orders jumped the queue ahead of the traditional orders of ordinary investors waiting to trade. According to plaintiffs, the use of these orders resulted in a system where plaintiffs "purchased and/or sold shares at artificially distorted and manipulated prices," including by paying higher prices for stocks. App'x at 358. Plaintiffs further allege that, unbeknownst to them, the proprietary data feeds and co-location services provided HFT firms with virtually exclusive access to detailed trading data in time to "front-run" other market participants by anticipating large pending transactions, buying and driving up the prices for the stocks

before those orders were placed, and forcing investors to pay more for those stocks than they otherwise would have.

We think that such allegations sufficiently plead that the exchanges misled investors by providing products and services that artificially affected market activity, *see Santa Fe Indus.*, 430 U.S. at 476, and that permitting such a case to proceed would be consistent with the "fundamental purpose of the [Exchange] Act . . . of [ensuring] full disclosure*," id.* at 477 (internal quotation marks and citation omitted), and the Exchange Act's "core concern for the welfare of long-term investors who depend on equity investments to meet their financial goals," Regulation NMS, 70 Fed. Reg. at 37,500; *see also SEC v. Zandford*, 535 U.S. 813, 819 (2002) (noting § 10(b) was enacted as part of an effort "to [e]nsure honest securities markets and thereby promote investor confidence" (internal quotation marks and citation omitted)).

The exchanges assert that the foregoing allegations are insufficient because the plaintiffs do not allege that the exchanges themselves engaged in any manipulative "trading activity." Appellees' Br. at 43-46. The exchanges do not cite, and we are not aware of, any authority explicitly stating that such a claim must concern a defendant's trading activity. Instead, § 10(b) and Rule 10b-5 prohibit "all fraudulent schemes in connection with the purchase or sale of securities," *A. T. Brod & Co. v. Perlow*, 375 F.2d 393, 397 (2d Cir.

1967), including schemes that consist of manipulative or deceptive "market activity," *see, e.g., Santa Fe Indus.*, 430 U.S. at 476 (noting manipulative conduct "refers generally to practices . . . [that] artificially affect[] *market activity*" (emphasis added)); *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011) (referring to "market activity"); *ATSI Commc'n*, 493 F.3d at 100 ("[C]ase law in this circuit and elsewhere has required a showing that an alleged manipulator engaged in *market activity* aimed at deceiving investors as to how other market participants have valued a security." (emphasis added)). Here, for the reasons described above, plaintiffs have sufficiently alleged that the exchanges engaged in conduct that manipulated market activity, including by deceiving investors into "believing that prices at which they purchase[d] and s[old] securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Gurary*, 190 F.3d at 45; *see also Santa Fe Indus.*, 430 U.S. at 476.

The exchanges also argue, and the district court found, that their alleged conduct was not manipulative or deceptive because it was disclosed to the public and approved by the SEC. In response, plaintiffs concede that the exchanges may have told ordinary investors about the *existence* of proprietary data feeds and co-location services, but assert that the exchanges did not publicly disclose the full range or cumulative effect that such services would have on the

market, the trading public, or the prices of securities. Plaintiffs further contend that the exchanges did not disclose, or selectively disclosed, complex order types.

It is true that "the market is not misled when a transaction's terms are fully disclosed." *Wilson*, 671 F.3d at 130 (internal quotation marks, citation, and alteration omitted). But here there is a contested question of fact as to the extent and accuracy of the disclosure. We must, at this stage, accept as true the factual allegations in the complaint and draw all reasonable inferences in favor of plaintiffs, including that the exchanges failed to disclose or omitted material facts to the investing public concerning these products and services. *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 711 n.5 (2d Cir. 2011).

We also note that although the SEC has approved proprietary data feeds, co-location services, and complex order types under certain circumstances, it has challenged them under other circumstances. It is not clear based on the pleadings whether or to what extent the SEC has sanctioned the defendants' conduct regarding the particular products and services in the instant case. We therefore are not persuaded that the action should be dismissed on this basis.[5]

---

[5] As the SEC notes in its amicus brief, however, when a plaintiff challenges actions of an SRO that are in accordance with rules approved by the SEC, the challenge may be precluded because it

Accordingly, we conclude that the plaintiffs have sufficiently pled that the exchanges misled investors by artificially affecting market activity and that the district court erred in dismissing this action on that basis. *See Santa Fe Indus.*, 430 U.S. at 476.

*b.  Primary Violator*

The district court also determined that the plaintiffs failed to allege that the exchanges committed "primary" violations of § 10(b) and Rule 10b-5. The district court reasoned that, although the exchanges may have enabled, and thus aided and abetted, HFT firms in manipulating the market, the law does not permit the exchanges to be held liable for simply aiding and abetting the firms' allegedly manipulative conduct. Plaintiffs challenge this determination on appeal.

The exchanges are correct that a plaintiff may not assert a private cause of action for aiding and abetting under § 10(b). *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994); *see also Fezzani v. Bear, Stearns & Co.*, 716 F.3d 18, 24 (2d Cir. 2013) ("[T]here is no aiding and abetting liability in *private*

would conflict with "Congress's intent that the SEC, with its expertise in the operation of the securities markets, make the rules regulating those markets." *See Lanier*, 838 F.3d at 155. Because we cannot make this determination based on the pleadings and the parties have not briefed this issue before the district court or this Court, we do not address that question here.

actions under Section 10(b)." (emphasis in original)).  Nevertheless, "[i]n any complex securities fraud . . . there are likely to be multiple violators," *Cent. Bank of Denver*, 511 U.S. at 191, and even an entity that plays a secondary role in a securities fraud case may be held liable as a primary violator, *Stoneridge*, 552 U.S. at 158, 166.  A primary violator is an entity that has "committed a manipulative act and thereby [has] participated in a fraudulent scheme."  *Fezzani*, 716 F.3d at 26 (internal quotation marks, citation, and alterations omitted).

The exchanges argue that we should adopt the district court's reasoning that the plaintiffs, at most, have pled that the exchanges aided and abetted the HFT firms by giving them the means to commit market manipulation.  It is true that if the HFT firms had not used these products and services, the plaintiffs could not have suffered their alleged harm.  But the plaintiffs do not assert that the exchanges simply facilitated manipulative conduct by the HFT firms.  Instead, the plaintiffs contend that the exchanges were co-participants with HFT firms in the manipulative scheme and profited by that scheme. The exchanges sold products and services during the class period that favored HFT firms and, in return, the exchanges received hundreds of millions of dollars in payments for those products and services and in fees generated by the HFT firms' substantially increased trading volume on their exchanges.

In doing so, according to plaintiffs, the exchanges "falsely reassured ordinary investors that their 'fair and orderly' trading platforms provided 'transparent trading' where all investors received market data in 'real time,'" when instead they had misrepresented and omitted critical information about products and services they were providing and had purposefully created a "two-tiered market" in which plaintiffs were "at an informational disadvantage." Appellants' Reply Br. at 23 (citing App'x at 259, 261, 285). More specifically, and as we have already described, the plaintiffs allege that the exchanges' co-location and proprietary feeds provided "HFT firms with an enhanced glimpse into what the market is doing before others who do not have similar access," App'x at 285, and that certain exchanges failed to "include important information about how their order types worked in their regulatory filings, or fail[ed] to make the filings altogether," which "deprived the investing public of adequate notice of order types," App'x at 293. According to plaintiffs, these actions "caused measureable harm to investors including, *inter alia*, increased opportunity costs from unexecuted fill orders, adverse selection and price movement bias on executed fill orders, and increased execution costs," App'x at 294, and caused "Plaintiffs and other Class members [to] purchase[] and/or s[ell] shares at artificially distorted and manipulated prices," App'x at 358, including by paying higher prices for stocks.

The plaintiffs therefore have sufficiently pled that the exchanges created a fraudulent scheme that benefited HFT firms and the exchanges, sold the products and services at rates that only the HFT firms could afford, and failed to fully disclose to the investing public how those products and services could be used on their trading platforms. They allege that, in doing so, the exchanges used the HFT firms to generate hundreds of millions of dollars in fees and established a system that, unbeknownst to the plaintiffs, catered to the HFT firms at the expense of individual and institutional traders. We think that such allegations sufficiently plead that the exchanges committed manipulative acts and participated in a fraudulent scheme in violation of the Exchange Act and Rule 10b-5. *See Fezzani*, 716 F.3d at 26.

### c. Other Grounds for Dismissal

The district court did not reach the exchanges' other arguments for dismissal, such as that plaintiffs had failed to adequately allege statutory standing, loss causation, and scienter. On appeal, the parties cursorily address these issues, but without the benefit of the district court's consideration, we decline to address them. On remand, they should be determined by the district court in the first instance.

**CONCLUSION**

For the foregoing reasons, we **VACATE** the district court's entry of judgment for the defendants-appellees and **REMAND** for proceedings consistent with this opinion.

LOHIER, *Circuit Judge, concurring*:

I agree with our resolution of the issues involved in this case and concur fully in the majority opinion. I write separately to remind the reader that after oral argument our panel requested and received a helpful amicus curiae brief from the Securities and Exchange Commission (SEC) addressing the questions of subject matter jurisdiction and immunity that the majority opinion so ably resolves. To the litany of reasons in support of the result in this case, therefore, I would add one more: deference to the SEC's reasonable and persuasive position on the specific questions before us. In my view, that position is especially persuasive because the SEC has significant, specialized expertise in exchange matters and information relating to the defendant exchanges, delegates its regulatory authority to the exchanges, retains extensive oversight over the exchanges' exercise of that authority, and understands the boundaries of that authority. Having independently arrived at the disposition (if not every approach) urged by the SEC, the majority opinion understandably opted to say nothing about deferring to the agency's position. But it would have been perfectly appropriate to defer here, at least with respect to the narrow issues we resolve, based on "the thoroughness evident in" the SEC's consideration of these

1

issues, "the validity of its reasoning," and the "consistency" of its position "with earlier and later pronouncements." <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944).