19-2622-cv
*Arch Ins. Co. v. Centerplan Constr. Co., LLC*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

# <u>SUMMARY ORDER</u>

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 31st day of March, two thousand twenty-one.

PRESENT:
> BARRINGTON D. PARKER,
> GERARD E. LYNCH,
> JOSEPH F. BIANCO,
> *Circuit Judges*.

------------------------------------------------------------------

ARCH INSURANCE COMPANY,

> *Plaintiff-Counter-Defendant-Appellee*,

v.                                                                                19-2622-cv

CENTERPLAN CONSTRUCTION CO., LLC,
ROBERT LANDINO, KELLY
LANDINO, CENTERPLAN DEVELOPMENT
CO., LLC, RAL INVESTMENTS, LLC,
WALNUT HILL CHASE, LLC, TINKER HOUSE,
LLC, CENTER EARTH, LLC,
CENTERPLAN COMMUNITIES, LLC, and GH
DEVELOPMENT, LLC,

> *Defendants-Counter-Claimants-Appellants*.

------------------------------------------------------------------

FOR PLAINTIFF-COUNTER-DEFENDANT-APPELLEE:

WILLIAM JAMES TAYLOR, White and Williams LLP, Philadelphia, Pennsylvania (Wolf, Horowitz, & Etlinger, LLC, Hartford, Connecticut, *on the brief*).

FOR DEFENDANT-COUNTER-CLAIMANTS APPELLANTS:

RAYMOND A. GARCIA, (Allan P. Hillman, *on the brief*), Garcia & Milas, P.C., New Haven, Connecticut.

Appeal from two decisions and a judgment of the United States District Court for the District of Connecticut (Bryant, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decisions and judgment of the district court are **AFFIRMED**.

Defendants-Counter-Claimants-Appellants Centerplan Construction Co., LLC ("Centerplan"), Center Earth, LLC ("Center Earth"), Centerplan Development Co., LLC ("Centerplan Development"), RAL Investments, LLC ("RAL Investments"), Walnut Hill Chase, LLC ("Walnut Hill"), Tinker House, LLC ("Tinker"), GH Development, Inc. ("GH Development"), Centerplan Communities, LLC ("Centerplan Communities"), and Robert and Kelly Landino (the "Landinos") (collectively "appellants") appeal from (1) the district court's memorandum decision granting summary judgment in favor of Plaintiff-Counter-Defendant-Appellee Arch Insurance Company ("Arch") on Arch's contractual indemnification, contractual collateral security, and disclosure of financial information claims, and dismissing Arch's common law indemnification, common law exoneration, and *quia timet* claims; (2) the district court's memorandum decision granting Arch's motion to dismiss appellants' Third Amended

2

Counterclaim for failure to state a claim; and (3) the district court's judgment in favor of Arch in the amount of $39,107,334.47. On appeal, appellants argue that the district court erred in granting summary judgment in favor of Arch in the amount that it awarded because the performance bond at issue was incorporated by reference into the indemnity agreements between Arch and appellants, and the performance bond expressly excluded indemnification for any damages covered by professional liability insurance. Therefore, according to appellants, Arch could not receive indemnification for any damages of that type. Appellants also contend that the district court improperly dismissed its Third Amended Counterclaim because the counterclaim plausibly alleged that Arch breached its duties under the bonds at issue by performing when it had no obligation to perform because the City of Hartford (the "City") and the Hartford Stadium Authority ("HSA") (collectively "Hartford") were in default, and Centerplan was not. We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal, which we reference only as necessary to explain our decision to affirm.

## BACKGROUND

Arch's claims arise out of three indemnity agreements – one dated July 10, 2010 between Centerplan, Centerplan Development, RAL Investments, the Landinos, and Arch; one dated October 15, 2010 between Walnut Hill, Tinker, GH Development, Centerplan, the Landinos, and Arch (together, the "2010 Indemnity Agreements"); and one dated January 26, 2016 between Centerplan, Centerplan Development, Center Earth, Centerplan Communities, RAL Investments, the Landinos, and Arch (the "2016 Indemnity Agreement") (collectively, the "Indemnity Agreements"). The parties executed the Indemnity Agreements as consideration for Arch's issuance of approximately fifty bonds as surety. Among those bonds, and at issue in this action,

3

are the payment and performance bonds issued as condition precedent to the award of the contract to Centerplan to construct a minor league baseball stadium in Hartford, Connecticut (the "Hartford Stadium Project").

A series of related agreements were executed in early 2015 in connection with the Hartford Stadium Project: On January 26, 2015, the City and Connecticut Double Play LLC formed a joint venture to develop a ballpark as memorialized by the Ballpark Development Agreement (the "BDA"). On February 4, 2015, the City and DoNo Hartford, LLC ("DoNo") executed the Development Services Agreement (the "DSA") to design, develop, and construct the Hartford Stadium Project. Anticipating the need for a design builder, that contract obligated DoNo to provide payment and performance bonds – either directly or from the design builder, and if the latter, then the parties would need to execute a Multiple Obligee Rider. As owner of the DSA, DoNo entered into a Design-Build Agreement (the "DBA") with Centerplan, which agreed to construct the Hartford Stadium Project. Centerplan, DoNo, and the City also entered into a "Direct Agreement" formalizing the City's right under the DSA to step into DoNo's role under the DBA in the event of a default by DoNo. *See* App'x at 541–42 (expressly disclaiming the City's rights under the DBA and duty to Centerplan). The performance bond, issued by Arch as surety on behalf of Centerplan as principal in favor of DoNo and Hartford as obligees, was conditioned on Centerplan's faithful performance under the DBA (the "Performance Bond"), and the payment bond was conditioned on the payment of all those who provided labor and materials in furtherance of the DBA and the Hartford Stadium Project (the "Payment Bond") (collectively, the "Bonds"). The parties also executed a Multiple Obligee Rider to the Bonds exculpating Arch and Centerplan in the event the obligees failed to make the required payments under the DBA.

4

The DBA required Centerplan to achieve "substantial completion" no later than March 11, 2016 and keep costs to $53,550,000; but in January 2016, the parties extended the substantial completion date and increased the maximum costs to accommodate a December 2015 change order. The City issued additional change orders and construction change directives which prevented Centerplan from being able to complete the Project by May 2016. On May 19, 2016, Hartford notified DoNo that it failed to meet the substantial completion deadline, and on May 27, 2016, notified Centerplan that it was in violation of the DBA. At a May 31, 2016 meeting (between Arch, the City, DoNo, and Centerplan), the City requested, over Centerplan's objections, that Arch become involved. One week later, the City terminated the DSA with DoNo and the DBA with Centerplan because of "continued defaults" by DoNo and Centerplan. On June 9, 2016, the City demanded Arch satisfy the Performance Bond. Arch commenced a thorough investigation through September 2016. On August 5, 2016, Arch gave notice to Centerplan of the claims on the Bonds and made a demand upon Centerplan to procure Arch's discharge from the Bonds and hold harmless and indemnify Arch for its losses incurred, and to be incurred, as a result of having issued the Bonds. This action followed.

## DISCUSSION

### I.    Grant of Summary Judgment in Arch's Favor

After careful evaluation of the text of the Indemnity Agreements, the district court determined that, under their unambiguous provisions, Arch was entitled to indemnification as a matter of law. In reaching this determination, the district court rejected appellants' contention that the DBA, Multiple Obligee Rider, and the Bonds create a complex and contradictory set of rights and obligations. Instead, the district court held that the Indemnity Agreements, and not the Bonds,

5

govern Arch's right of indemnification. The district court further concluded that, because actual liability is not required under the Indemnity Agreements, such liability was "not a precursor to indemnification under [the] indemnity agreement," Special App'x at 21, and appellants "executed express Indemnity Agreements in favor of Arch obligating them to provide indemnification when Arch settled claims in good faith," Special App'x at 22. With respect to the issue of bad faith, the district court held that "[d]efendants have failed to provide evidence from which a jury could reasonably conclude that Arch acted on the Hartford Stadium payment and performance bonds in bad faith." Special App'x at 50. Therefore, the district court granted summary judgment on Arch's contractual indemnification claim in the amount of $39,107,334.47.

We review a grant of summary judgment *de novo*. *Gorman v. Rensselaer County*, 910 F.3d 40, 44 (2d Cir. 2018). In doing so, we "constru[e] the evidence in the light most favorable to the nonmoving party and draw[] all reasonable inferences in that party's favor." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and . . . is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

On appeal, appellants argue that the district court erred in granting summary judgment to Arch because the Bonds were incorporated by reference into the Indemnity Agreements and, based upon the professional liability insurance exclusion in the Performance Bond, appellants would be entitled to deduct the money Arch paid that was covered by that insurance. As set forth below, we agree with the district court's well-reasoned analysis and conclude that summary judgment on Arch's claim was properly granted.

6

The Indemnity Agreements undisputedly cover the claims at issue and provide that Arch is entitled to indemnity from appellants, and thus, the only question on appeal is whether appellants' indemnity liability is determined by the terms of the Bonds. We conclude that it is not.

The Bonds were not incorporated by reference because the contracts were not all part of a single transaction under Connecticut law. A contract may incorporate other documents either expressly or by reference. *See Randolph Constr. Co. v. Kings East Corp.*, 334 A.2d 464, 467 (Conn. 1973). "When there are multiple writings regarding the same transaction, the writings should be considered together to determine the intent of the parties." *Mongillo v. Comm'r of Transp.*, 571 A.2d 112, 115 (Conn. 1990).

The Connecticut Supreme Court has observed that "the determination that the documents constitute a single agreement must be made on a case-by-case basis." *Gold v. Rowland*, 156 A.3d 477, 486 (Conn. 2017). In order to determine whether a series of contracts is part of the "same transaction," Connecticut courts evaluate, *inter alia*, the identities of the parties, the simultaneity or temporal proximity of execution, the similarity of the subject matter, and any cross-referencing or interdependency between the contracts. *See, e.g.*, *Frantz v. Romaine*, 889 A.2d 865, 872 (Conn. App. Ct. 2006) ("Here, the parties executed the note, the mortgage, the restrictive covenant and the purchase option on the same day. All of the instruments concern the same real property. Furthermore, each of the four instruments involve the plaintiff's $1.8 million loan to the defendants. The several documents also cross-referenced one another. The purchase option, for instance, specifically referred to the promissory note, the obligations of the defendants under it and the mortgage. Finally, all of the instruments involve the same parties. We conclude that the four instruments should be considered together in order to interpret the terms of the contract as to

7

the intent of the parties."); *Webster Fin. Corp. v. Levine*, No. X06CV074016194S, 2009 WL 1056564, at *1 (Conn. Super. Ct. Mar. 24, 2009) ("The NSA, the stock purchase agreement and the employment agreement were not only all executed on the same day as part of the sales transaction, but they also refer to each other."). Where the contracts involve different parties, courts must exercise caution. *See Gold*, 156 A.3d at 486–87 (collecting cases).

Although appellants argue that this issue should not be decided on summary judgment, the Connecticut Supreme Court has made clear that, where the language in the agreements is clear and definitive, the "determination of the extent to which the indemnity agreement was incorporated, if at all" presents a "question[] of law" that may be resolved on summary judgment. *Allstate Life Ins. Co. v. BFA Ltd. P'ship.*, 948 A.2d 318, 324 (Conn. 2008). Moreover, "in determining the intent of the parties to these contracts, we are limited to the express contractual language and the parties' intent as they expressed it in the agreements." *Id*. at 323. Here, it is clear and definitive that the Indemnity Agreements did not incorporate by reference the terms of the Bonds, the DBA, or the DSA.

First, the Indemnity Agreements do not involve identical parties to the Bonds, the DSA and the DBA: The Bonds were issued by Arch to Centerplan as principal with DoNo and the City as obligees; the DSA was between the City and DoNo; the DBA was between DoNo and Centerplan; and the Indemnity Agreements were between Arch, Centerplan, the Landinos, and other appellants. Second, the Indemnity Agreements can hardly be characterized as signed with temporal proximity to the other contracts. The Bonds, DSA, and DBA were executed simultaneously, but the 2010 Indemnity Agreements were executed almost five years earlier and the 2016 Indemnity Agreement was executed one year later. Third, the Indemnity Agreements

8

refer generally to bonds to be issued by Arch in favor of Centerplan; indeed, almost 50 such bonds were issued related to a wide array of projects. However, none of the Indemnity Agreements specifically reference the Hartford Stadium Project or the Bonds issued in connection therewith. The fact that the DSA and DBA required the Payment and Performance Bonds, and that those Bonds were issued pursuant to the Indemnity Agreements, does not change the analysis. There is nothing in the terms or structure of the documents at issue that would reasonably support a finding that indemnity liability would be determined by the terms of the Bonds, rather than the express terms of the Indemnity Agreements. In short, the district court correctly determined that the Indemnity Agreements did not incorporate the Bonds, DBA, or DSA by reference.

Applying the terms of the Indemnity Agreements to the circumstances here, the Indemnity Agreements *only* exempt payments made by Arch in bad faith. The 2010 Indemnity Agreements have identical provisions which provide that "Indemnitors agree to indemnify and hold harmless Surety for *any and all Loss sustained or incurred* by reason of having executed any and all Bonds." App'x at 65, 73 (emphasis added). Loss broadly includes "[a]ny and all liability, losses, costs, expenses, and fees of whatever kind or nature, that Surety may sustain or incur as a result of executing any Bond or as a result of the failure of Principal or Indemnitors to perform or comply with this Agreement." App'x at 65, 73. Under the 2016 Indemnity Agreement, "the Surety shall be entitled to charge for *any and all disbursements* made by it *in good faith* in and about the matters herein contemplated by this Agreement under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, *whether or not such liability, necessity or expediency existed*." App'x at 82 (emphasis added). The terms

9

of the Indemnity Agreements create no exception for situations where there is no actual liability under the Bonds.

To the extent appellants attempt to challenge the district court's conclusion regarding the absence of any evidence of bad faith, we find such arguments unpersuasive. If an indemnity agreement, like the ones at issue here, makes clear that any evidence of payment provides "*prima facie* evidence of the fact and amount of the liability to the surety," App'x at 82–83; *see also* App'x at 65, 73 (obligating the Indemnitors to accept "voucher[s] or other evidence of such payments as prima facie evidence of the fact and extent of the liability of Indemnitors to Surety in any demand, claim or suit by Surety against Indemnitors"), then the burden switches to appellants to prove the surety's payments were made in bad faith. *See PSE Consulting, Inc. v. Frank Mercede & Sons, Inc.*, 838 A.2d 135, 144 (Conn. 2004). In attempting to meet this burden, appellants simply take their argument regarding incorporation of documents and re-cast it in the language of bad faith – that is, appellants argue that Arch acted in bad faith because it refused to return or credit the money that was paid in violation of the professional liability insurance exclusion in the Performance Bond. However, because the terms of the Bonds were not incorporated into the Indemnity Agreements and actual liability was irrelevant to payment under those Agreements, Arch did not act in bad faith in failing to recognize a "carve-out" for money paid that would be covered (according to appellants) under the professional liability insurance in the performance bond. Given the absence of any other evidence (or even argument) of bad faith by Arch in investigating the numerous bond

10

claims and determining its bond liability, Arch was entitled to the full amount of the indemnity liability for all the bond payments it had made.[1]

Accordingly, the district court properly granted summary judgment in Arch's favor in the amount of $39,107,334.47.

## II.     Dismissal of the Third Amended Counterclaim

The Third Amended Counterclaim alleges that, because the City was in default under the DSA by not putting aside in advance money to pay for additional work, Arch had no obligation to pay on the Bonds under the Multiple Obligee Rider. According to appellants, given that Arch had no duty to pay on the Bonds in light of the City's breach, Arch thereby breached the terms of the Performance Bond by doing so. As set forth below, the district court correctly determined that Centerplan (as the principal on the Performance Bond) had no cause of action for breach of that bond against its own surety, Arch.

We review the grant of a motion to dismiss *de novo*, "accepting as true all factual allegations in the complaint and drawing all reasonable inferences in favor of the non-moving party." *City of Providence v. BATS Glob. Mkts., Inc.*, 878 F.3d 36, 48 (2d Cir. 2017). Additionally, at the motion to dismiss stage, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *accord Ashcroft*

---

[1] Following the summary judgment decision, in an abundance of caution, the district court allowed appellants an opportunity to obtain additional documents from Arch in order to ensure that appellants had the information necessary to lodge any specific objections to the indemnification amount awarded to Arch. In their supplemental submission, appellants did not provide any evidence as to a computational error in terms of the amount of the award based on the district court's interpretation of the documents at issue, but rather simply re-argued the other contentions that had already been rejected by the district court. Similarly, on appeal, appellants have presented no evidence from which a factfinder could rationally conclude that any of Arch's specific bond payments were beyond the scope of the Performance Bond. Accordingly, there is no basis to disturb the amount of the award.

11

*v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

As a threshold matter, appellants lack the legal right to assert a breach of contract claim against Arch because Arch owed no duty to appellants under the Bonds. A suretyship is a tripartite relationship, where the surety undertakes to perform a contract to the obligee, if the principal fails to do so. *See Elm Haven Constr. Ltd. P'ship v. Neri Constr., LLC*, 281 F. Supp. 2d 406, 412 (D. Conn. 2003), *aff'd.*, 376 F.3d 96 (2d Cir. 2004). "It is axiomatic that a performance bond runs to the benefit of the obligee." *Town of Southington v. Comm. Union Ins. Co.*, 757 A.2d 549, 556 (Conn. 2000). There is no basis under Connecticut law for concluding that such a contract creates liability by the surety to the principal such that the principal can assert a breach of contract claim against the surety.

Here, appellants' Third Amended Counterclaim arises out of the Multiple Obligee Rider, between Arch as "Surety" on behalf of Centerplan as "Principal," in favor of DoNo and Hartford as "Obligees." App'x at 551. Under the terms of that contract,

> [T]here shall be no liability on the part of the Principal or Surety under this Bond to the Obligees, or any of them, unless the Obligees, or any of them, shall make payments to the Principal, or to the Surety in case it arranges for completion of the Contract upon default of the Principal, strictly in accordance with the terms of said Contract as to payments, and shall perform all the other obligations required to be performed under said Contract at the time and in the manner therein set forth.

App'x at 551. The Multiple Obligee Rider by its terms created conditions precedent that Hartford and DoNo were required to satisfy, but it said nothing that would create an obligation stemming

12

from Arch to appellants. Appellants only cite one Connecticut case in which a principal brought a breach of contract claim, albeit unsuccessfully, against a surety.[2] *See PSE Consulting.*, 838 A.2d at 143-44 (observing that the jury found that the surety had not breached the indemnity agreement, but that it had breached the implied covenant of good faith and fair dealing). Importantly, that action turned on good faith in connection with a provision of the bond which required the surety to "pay only claims upon the payment bond that were undisputed." *Id.* at 153. Arch had no such obligation here, nor is there any evidence of bad faith, and the Multiple Obligee Rider created no contractual duty from surety to principal in this case. In the absence of such a contractual duty, a breach of contract claim by the appellants cannot lie against Arch, and the district court properly dismissed the Third Amended Counterclaim on that ground.

In any event, the district court also correctly concluded in the alternative that, even if a duty existed, appellants failed to plead facts that could plausibly establish that the City breached its contractual obligation. In particular, as noted above, appellants' Third Amended Counterclaim arises out of the Multiple Obligee Rider to the Bonds, and Arch concedes that the exculpatory clause in the Multiple Obligee Rider "sets forth a condition precedent to Arch's obligations under the [Performance B]ond." Appellee's Br. at 52. However, the "said Contract" that was referenced in the Performance Bond and in the Multiple Obligee Rider was the DBA between Centerplan and DoNo, and no other contract. Therefore, only a term of the DBA, to which the City is not a party, could trigger the condition precedent clause. In other words, any alleged breach by the City of the

---

[2] Although appellants also rely on *Associated Constr. AP Constr., LLC v. Hanover Ins. Co.*, No. 3:15-cv-1600 (MPS), 2018 WL 3998968, at *14 (D. Conn. Aug. 21, 2018), that case is inapposite because it concerned a surety's liability for breach of the bond to the obligee, not the principal.

DSA was irrelevant to the exculpatory clause for the DBA and had no impact on Arch's obligations under the Bonds. Given that the Third Amended Counterclaim attempts to allege a breach by the City of the DSA, it could not trigger the exculpatory clause related to the DBA and excuse Arch's performance under the Bonds. In short, the district court properly dismissed appellants' Third Amended Counterclaim for failure to plausibly allege a breach.

*   *   *

We have considered appellants' remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the decisions and judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

14